Filed 10/17/14  N.N. v. Superior Court CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| N.N.,<br><br>    Petitioner,<br><br>    v.<br><br>THE SUPERIOR COURT OF TULARE COUNTY,<br><br>    Respondent;<br><br>TULARE COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>    Real Party in Interest. | F069542<br><br>(Super. Ct. No. JJV066503A)<br><br>**O P I N I O N** |

THE COURT*

ORIGINAL PROCEEDINGS; petition for extraordinary writ review.  Hugo J. Loza, Commissioner.

Jean Bourn for Petitioner.

No appearance for Respondent.

Kathleen Bales-Lange, County Counsel, John A. Rozum and Carol E. Helding, Deputy County Counsel, for Real Party in Interest.

---

*Before Cornell, Acting P.J., Kane, J., and Franson, J.

-ooOoo-

Petitioner N.N., the designated prospective adoptive parent of Isaac N., seeks extraordinary writ relief (Welf. & Inst. Code, § 366.28[1]; Cal. Rules of Court, rule 8.456[2]) from the juvenile court's order removing the child from her home.

Petitioner argues that the trial court used the wrong standard of proof and was confused as to who had the burden of proof at the section 366.26, subdivision (n), removal hearing, and that there was insufficient evidence to support Isaac's removal. She also contends that Tulare County Health and Human Services Agency's (the agency) removal notice was untimely. We find no error in the juvenile court's removal order, and deny the requested relief.

## FACTUAL AND PROCEDURAL BACKGROUND

*Initial Placement of Isaac*

Isaac, born drug exposed in September of 2012, was detained by the agency and placed two days later with petitioner, a county licensed foster parent. Isaac suffered from tremors, stiff body and feeding difficulties, as a result of his drug exposure. He was also diagnosed with a heart murmur.

In July of 2013, another child, Blake, no relation to Isaac, was placed in petitioner's home. Blake also suffered from failure to thrive.

In a report generated for an August 2013 selection and implementation hearing, petitioner was described as "diligent in meeting Isaac's needs," taking him to all of his medical and developmental appointments, caring for and loving him since birth, and giving him "a lot of one of one care." The Court Appointed Special Advocate (CASA)

---

[1]    All statutory references are to the Welfare and Institutions Code.

[2]    All rules references are to the California Rules of Court.

2

for Isaac, asked that she be relieved because petitioner was committed to meeting all of Isaac's needs and adopting him.

On August 31, 2013, petitioner filed an "Application for Adoption of a Child." Parental rights for Isaac's biological parents were terminated on October 3, 2013, and an adoption plan ordered.

*Referrals and Removal of Isaac*

In November of 2013, the agency received a referral that petitioner left both Isaac and Blake unattended in her vehicle while she went into a store. An officer who responded to the scene was told the crying children had been in the vehicle for about 15 minutes and when petitioner came back to the vehicle, she was uncooperative and left. The officer located petitioner, who told him she had let a friend use her vehicle and that the friend was going to take the children to daycare. Petitioner refused to name the friend. When the officer informed petitioner that she would be seen in the store's surveillance video, she admitted leaving the children unattended while she shopped.

The agency investigated the allegation and met with petitioner. Petitioner insisted she was not overwhelmed and did not need additional services. The child abuse referral was substantiated.

It then came to the agency's attention that petitioner's boyfriend had not been cleared to be around the children through the required "Live Scan" fingerprinting process. It was later discovered that petitioner's boyfriend had criminal convictions, which would require an exemption before he could be approved as a regular care provider for any foster child.

In December of 2013, petitioner dropped Blake off with his biological parents for a visit. He was transported to the visit in an outdated car seat. The car seat was replaced shortly thereafter. Petitioner was cited a deficiency and the matter closed.

Later in December, petitioner left Blake unsupervised with his biological mother and sister. In January of 2014, the agency began an investigation regarding petitioner leaving Blake with his mother without official supervision. Petitioner denied it happened, claiming she supervised the visits.

On January 23, 2014, when asked by agency social workers, petitioner claimed Blake was always in her care unless he was at a supervised visit. She also stated that, when she worked, she left Blake and Isaac in the care of her boyfriend, although she admitted he had not yet been fingerprinted. The agency immediately removed Blake from petitioner. Isaac was then also detained.

Petitioner objected to Isaac's removal and requested a grievance hearing. Petitioner and Isaac had several supervised visits in January and February of 2014.

The investigation continued and Blake's paternal grandfather stated that petitioner was not with Blake at the visit on December 25. The paternal grandfather had heard from other family members that this was not the first time Blake was left unsupervised with his mother. Blake's paternal grandmother also stated that petitioner was not present at Blake's visit.

On February 10, 2014, petitioner met with licensing investigators and insisted she was with Blake during the visits. When confronted with details provided by Blake's paternal grandmother, petitioner admitted that she had allowed the unsupervised contact. The allegation against petitioner was substantiated.

*Proceedings*

On February 25, 2014, petitioner filed a Request for Disclosure of Juvenile Case File (form JV-570). In her petition, petitioner stated that she believed she was a prospective adoptive parent, that Isaac was medically fragile, and that she held the medical and educational rights for the child. Petitioner also filed a request for de facto parent status (form JV-296).

4

That same day, the agency filed a Request to Change Court Order (form JV-180) asking the juvenile court vest health and education rights of Isaac with his then foster parents. The reason given for the change was that petitioner's license was being revoked as a result of licensing violations. The request was granted.

On March 3, 2014, the agency filed a Notice of Emergency Removal (form JV-324). In it, the agency noticed the court that Isaac had been removed from an "identified adoptive placement" on January 23, 2014.

At the subsequent hearing several days later, petitioner was designated the Prospective Adoptive Parent and the De Facto Parent. Petitioner made no objection of untimely service of the Notice of Emergency Removal (form JV-324). The juvenile court denied petitioner's requests to resume visits with Isaac. A contested section 366.26, subdivision (n), hearing on Isaac's removal was set for April 3, 2013.

On March 13, 2014, the juvenile court granted petitioner access to the entire court file and requested narratives in Isaac's case. Petitioner also requested very limited discovery in Blake's case as well because it was allegedly the basis for the removal of Isaac from petitioner's home. The juvenile court asked petitioner to file a motion to that effect.

On March 18, 2014, a section 366.3 review hearing was held. Isaac was found to be doing well and the adoption plan continued.

Soon after, petitioner filed a Request for Disclosure of Juvenile Case File (form JV-570) seeking records from Blake's case, because Isaac had been removed from her home because she had allowed an unsupervised visit for Blake.

On April 3, 2014, petitioner requested continuance of the matter because neither party had received the documents requested in their respective "827" petitions on Blake's case.[3]

After numerous continuances (at the request of both parties), the hearing finally began May 22, 2014, four months after the detention of Isaac. In the interim, petitioner had had several visits with Isaac, which went well.

The contested hearing continued for four days. The juvenile court took judicial notice of the court file in Isaac's case and received various exhibits as evidence, including narratives for both Isaac and Blake.

Petitioner testified she had been a foster parent for a little over two years and had taken a class on drug exposed infants. She had a leadership role in a local foster parent association and mentored new foster parents. She had been working outside the home about 28 hours a week, but was now working about 22 hours a week.

According to petitioner, she had been with her boyfriend for about seven years. She acknowledged he had not gone through the required "live scan process" before providing childcare for her foster children. Petitioner admitted lying to the police officer and social workers when questioned about leaving the children unattended in the car. She acknowledged she had lied about Blake's visits with his family at Christmas on two occasions when she left them unsupervised. She also acknowledged "posting" photographs of a foster child on social media, against foster care regulations.

Petitioner testified that she had a mother/child bond with Isaac. She was willing to accept services and cooperate with the agency if Isaac was returned to her care. She was also willing to continue contact between Isaac and his current foster parents.

---

[3]     Section 827 "governs the granting of access to confidential juvenile records by individuals and the public." (*In re Elijah S.* (2005) 125 Cal.App.4th 1532, 1541.)

The adoption social worker testified that petitioner had done a "very good job" with Isaac, but petitioner did not have an approved home study at the time he was removed. The social worker admitted that the JV-324 removal notice had not been timely served. The agency believed it was in Isaac's best interest to remain where he was placed.

The social worker for Blake testified that, while Blake had not been diagnosed as drug exposed, he had symptoms of such. Supervised visits for Blake were ordered because his parents had a history of drug use and father had a history of violence, a fact known to petitioner. The couple had lost custody of four other children before Blake was removed.

A licensed marriage and family therapist, an expert witness in attachment theory in the assessment and treatment of attachment disorders, testified that a child can have a small number of placements without it being disruptive. The expert opined that being a drug exposed infant did not necessarily place Isaac at risk of an attachment disorder. The expert observed Isaac in his current foster care placement and found no attachment problems or issues. While the expert, who had not seen petitioner with Isaac, could not agree that petitioner was a good mother, he did feel that Isaac had received good care or at least did not "experience pathogenic care" from petitioner. The expert opined that it would be best to leave Isaac where he was currently.

After the agency presented its case, petitioner asked that the juvenile court dismiss the matter because the agency had failed to follow the law regarding an emergency removal of Isaac and failed to meet its burden for continued removal of the child. The juvenile court denied the request.

A licensed clinical psychologist testified that she met with petitioner on two occasions. She was not aware that petitioner had lied to authority about her children being left unattended in a vehicle; that petitioner had allowed two, not one, unsupervised

visits for Blake; and that petitioner's boyfriend had criminal convictions. She agreed that frequent placement moves would increase the risk of a child developing an attachment disorder.

The foster home licensing supervisor testified that the unit licensing county foster homes provides training for foster parents and investigates licensing referrals. But it is Community Care Licensing that revokes a foster care license. Foster parents receive a copy of the actual policy or packet of regulations/rules of running a foster home. At the time of the hearing, petitioner had two licensing violations pending with the Licensing Board; one involved allowing the unsupervised visits for Blake and the other involved the Facebook postings.

Before argument by counsel, the juvenile court reiterated that it was the agency's burden to justify the continued removal of Isaac from petitioner and that not returning the child to her would be in the child's best interest.

While petitioner asked that Isaac be returned to her care, counsel for Isaac disagreed. Counsel questioned petitioner's veracity and was concerned about the care and long-term stability Isaac would receive with petitioner.

Following all evidence and arguments, the juvenile court stated:

> "There's been a great deal of testimony, a lot of written documents have been submitted, and I think we are all at least of the opinion that what's at issue here is what's in the best interest of the child, the long-term interest of the child, because I think that is the paramount issue. [¶] It's not whether [petitioner] would be a better parent than the current caretakers or that [petitioner] is more deserving than the current caretakers to be the parent or caretaker of Isaac. The issue is what's in the best interest of the child long term."

After reviewing the various licensing violations, petitioner's conduct, and the agency's concerns, the juvenile court concluded that the agency acted appropriately in removing Isaac:

8

" … [B]ased on all the evidence that I heard that it does appear to me that it would be irresponsible for the agency to ignore all this and irresponsible for the Court to ignore this and assume these things didn't happen. These are serious violations that [petitioner] engaged in."

## DISCUSSION

### I. BURDEN OF PROOF

Petitioner argues that the juvenile court used the wrong standard of proof and was confused as to who had the burden of proof at the section 366.26, subdivision (n) removal hearing.  We disagree.

Section 366.26, subdivision (n), details the procedure for judicial review of both emergency and nonemergency removals from a designated prospective adoptive parent. (§ 366.26, subd. (n)(3) & (4).)[4]  With the exception of the notice requirement, the same

---

[4]     Section 366.26, subdivision (n), provides in relevant part: "(3) Prior to a change in placement and as soon as possible after a decision is made to remove a child from the home of a designated prospective adoptive parent, the agency shall notify the court, the designated prospective adoptive parent …, the child's attorney, and the child, if the child is 10 years of age or older, of the proposal …."

> "(A) Within five court days or seven calendar days, whichever is longer, of the date of notification, the child, the child's attorney, or the designated prospective adoptive parent may file a petition with the court objecting to the proposal to remove the child, or the court, upon its own motion, may set a hearing regarding the proposal.  The court may, for good cause, extend the filing period ….

> "(B) A hearing ordered pursuant to this paragraph shall be held as soon as possible and not later than five court days after the petition is filed with the court or the court sets a hearing upon its own motion, unless the court for good cause is unable to set the matter for hearing five court days after the petition is filed, in which case the court shall set the matter for hearing as soon as possible.  At the hearing, the court shall determine … whether the proposed removal of the child from the home of the designated prospective adoptive parent is in the child's best interest, and the child may not be removed from the home of the designated prospective adoptive parent

9

hearing procedures apply to both types of removal and, in each case, the agency "must prove by a preponderance of the evidence that the removal is in the best interest of the child." (Cal. Rules of Court, rules 5.728(f), 5.727(g); see also *T.W. v. Superior Court* (2012) 203 Cal.App.4th 30, 45.) Further, "the child may not be removed from the home of the designated prospective adoptive parent unless the court finds that removal is in the child's best interest." (§ 366.26, subd. (n)(3)(B); see also *id.*, subd. (n)(4).) The juvenile court's decision is reviewed for an abuse of discretion. (*In re N.M.* (2011) 197 Cal.App.4th 159, 171.)

To support her argument, petitioner cites four instances in the record as "[e]vidence of the court's confusion." We find none helpful to her argument.

*Standard of Proof*

Petitioner claims the juvenile court used the incorrect standard of proof, namely abuse of discretion instead of preponderance of the evidence, that removal from the prospective adoptive parent is in the child's best interests. In support of her argument,

---

unless the court finds that removal is in the child's best interest.… [¶] … [¶]

"(4) Notwithstanding paragraph (3), if the State Department of Social Services, county adoption agency, or a licensed adoption agency determines that the child must be removed from the home of the caretaker who is … a designated prospective adoptive parent immediately, due to a risk of physical or emotional harm, the agency may remove the child from that home and is not required to provide notice prior to the removal. However, as soon as possible and not longer than two court days after the removal, the agency shall notify the court, the caretaker who is … a designated prospective adoptive parent, the child's attorney, and the child, if the child is 10 years of age or older, of the removal. Within five court days or seven calendar days, whichever is longer, of the date of notification of the removal, the child, the child's attorney, or the caretaker who is … a designated prospective adoptive parent may petition for, or the court on its own motion may set, a noticed hearing pursuant to paragraph (3).…"

10

petitioner first cites a discussion which took place at the initial removal hearing. Towards the end of the hearing, petitioner requested that visitation, which had been halted when Isaac was removed, be reinstated. The juvenile court stated that it did not think it had the authority to do so because "that basically falls at the discretion of the agency." The juvenile court was not referring to the agency's discretion to remove Isaac, but only whether the court had the authority to reinstate visits. In denying the request, the juvenile court invited counsel's input, but no such authority was cited.

Petitioner also faults the juvenile court, in making its ruling, for finding that the agency "acted appropriately." We assume petitioner's reference to this wording is again to show that the juvenile court incorrectly used an abuse of discretion standard. We disagree. The juvenile court's words were prefaced by the statement that the "issue here is what's in the best interest of the child, the long-term interest of the child," followed by a lengthy recitation of evidence supporting the allegations of petitioner's foster care violations, sufficient to show by a preponderance of the evidence the agency's removal of Isaac from petitioner's care was appropriate.

Petitioner also claims the juvenile court incorrectly believed it was reviewing the agency's action for abuse of discretion when it stated:

> "As far as I'm concerned in this hearing, to me it's not so much whether this kid is - whether [petitioner] took you know good care of these kids. I mean the social workers are basically saying she did. She obviously made some mistakes and those are the issues as far as I'm concerned .…"

Again, we disagree with petitioner because she has failed to put the juvenile court's statement in context. At this point in the proceeding, much of the evidence concerned the various visits petitioner had had with Isaac and how well they had gone. The juvenile court voiced concern that "a lot of time" was "wasted" "on matters that are obvious." When counsel for petitioner reminded the juvenile court that "the big issue is

11

always that best interest thing we end up with," the juvenile court replied, "That's why I allowed some latitude but at a certain point it becomes redundant."

*Burden of Proof*

Finally, petitioner claims the juvenile court was confused as to who had the burden of proof, citing a discussion which took place on the final day of the removal hearing prior to closing argument between the juvenile court and Ms. Bourn, counsel for petitioner:

> "THE COURT:  All right.  Okay.  I'll let you go have the first and last word.
>
> "MS.  BOURN:  Me. I think the burden - I would like to have the first and last word.
>
> "THE COURT:  You think they have the burden?"

Once more, petitioner fails to include the remainder of the colloquy, which went as follows:

> "MS. BOURN:  They have the burden.
>
> "THE COURT:  All right.  I'll give them the first and last word.
>
> "MS. BOURN: I'd love to have the first and last word.
>
> "THE COURT:  Go ahead.  Since the agency has the burden, go ahead.
>
> "MS. HELDING [counsel for the agency]:  Okay.  I thought Ms. Bourn wanted to.
>
> "MS. BOURN:  I'll take it if you want to give it to me.  I don't want that to be a reason for arguing at a later date.
>
> "MS. HELDING:  Whatever the Court wants is fine.
>
> "THE COURT:  It's your burden.  It's true, that the agency needs to justify the removal of this child and if removal was appropriate and necessary and in the best interest of the child and that returning the child to [petitioner] would not be in the child's best interest.  Go ahead."

12

So while the beginning of the conversation is a bit confusing, the juvenile court is clear at the end that it is the agency which has the burden of proof.

## II. SUFFICIENCY OF THE EVIDENCE

Petitioner next argues there was insufficient evidence to support the juvenile court's determination that Isaac should be removed from her home. Specifically, petitioner alleges the juvenile court did not make adequate factual findings that removal of Isaac was in his best interest, nor did the juvenile court consider the bond between petitioner and Isaac. In support of her argument, petitioner cites the social worker who said petitioner had done a "good job" with Isaac. She also notes that the agency expert had said petitioner had not abused or neglected Isaac and he was therefore not at risk, but received "good care." We find her argument unavailing.

As stated earlier, at a removal hearing, the juvenile court must determine "whether the proposed removal of the child from the home of the designated prospective adoptive parent is in the child's best interest, and the child may not be removed from the home of the designated prospective adoptive parent unless the court finds that removal is in the child's best interest." (§ 366.26, subd. (n)(3)(B).) "This determination was committed to the sound discretion of the juvenile court, and the trial court's ruling should not be disturbed on appeal unless an abuse of discretion is clearly established." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.) The test is whether the juvenile court exceeded the bounds of reason. (*Ibid.*) When two or more inferences can reasonably be deduced from the evidence, the reviewing court has no authority to substitute its decision for that of the juvenile court. (*Id.* at p. 319.)

The concept of best interest "is an elusive guideline that belies rigid definition. Its purpose is to maximize a child's opportunity to develop into a stable, well-adjusted adult." (*Adoption of Michelle T.* (1975) 44 Cal.App.3d 699, 704; see also *In re Ethan N.* (2004) 122 Cal.App.4th 55, 66.) A primary consideration in determining the child's best

13

interest is the goal of assuring stability and continuity of care. (*In re Stephanie M., supra,* 7 Cal.4th at p. 317.) This can occur only by considering all the evidence available to the court at the time the court makes its decision regarding removal of the child. (*State Dept. of Social Services v. Superior Court* (2008) 162 Cal.App.4th 273, 286-287.)

Applying these standards, we find that the juvenile court adequately considered what was in Isaac's best interests and that sufficient evidence supports the juvenile court's decision. In making its ruling, the juvenile court first stated that "what's at issue here is what's in the best interest of the child, the long-term interest of the child …." While the juvenile court noted that petitioner was a "good, kind-hearted person" who did not intend to harm anyone, "[t]here are issues of lack of good judgment and credibility and truthfulness …."

The juvenile court found that "the car seat incident" was minor and promptly corrected, but the issue of petitioner posting a photograph of a foster child online was slightly more important. The juvenile court was more concerned with the evidence before it that petitioner, who had had enough training as a foster parent to be called upon to mentor new foster parents, made various serious mistakes in caring for Isaac and Blake. There was evidence that petitioner left both Isaac and Blake in an unattended, unlocked vehicle while she went shopping, an act the juvenile court found to be "a significant lack of judgment, because it exposed these children to the risk of serious harm …." The juvenile court opined that this incident in itself "could have led to the children being removed." The juvenile court was concerned with petitioner's "extremely poor judgment" as well as her "not being truthful" about the incident.

The juvenile court also found significant the evidence that petitioner's relationship with her boyfriend and his involvement with Isaac was more substantial than she disclosed. Petitioner was advised early on that her boyfriend had to participate in a fingerprinting process if he was to have significant contact with Isaac or other foster

14

children.  Petitioner did not comply, even though Isaac referred to him as "daddy" and petitioner relied on him to regularly provide child care for Isaac and Blake.  Later still, it was discovered that the boyfriend had two prior convictions for drunk driving.

Finally, the juvenile court emphasized the evidence that petitioner facilitated two unsupervised visits for Blake with his biological family, even though she was aware of his family's drug issues and that his visits were to be supervised.  When confronted with these allegations, petitioner's first reaction was to lie and deny the actions to various authorities - licensing investigators and various social workers.  The juvenile court was most concerned with the fact that petitioner knew the rules and regulations regarding the court orders in place for Blake and the reasons for the supervised visits and still chose to violate them.

Both experts who testified agreed that stability was important for a child.  The juvenile court found the agency's actions in removing Isaac to be reasonable because "a pattern of inappropriate behavior on the part of [petitioner] and then a propensity to either conceal the truth or outright lie about her behavior" could lead to unreasonable risk of harm to Isaac.  The court's concern that petitioner's pattern of behavior could once again lead to the removal of Isaac from her care undermined Isaac's stability.

The juvenile court's comments are supported by testimony at the removal hearing and by the numerous reports prepared over the course of this dependency proceeding.  On this record, we find no abuse of discretion in the juvenile court's finding that removal from petitioner's home was in Isaac's best interest.

III.    TIMELINESS OF NOTICE

Petitioner's final argument is that the agency violated the law when it failed to timely notice the court, and the juvenile court failed to hold it accountable.  We find no prejudicial error.

As noted earlier, Isaac was removed from petitioner's home on January 23, 2014, without a removal hearing. In an emergency situation, the agency can remove the child before a removal hearing, but "as soon as possible and not longer than two court days after the removal, the agency shall notify the court … of the removal." (§ 366.26, subd. (n)(4).)[5] Here, the agency did not timely serve the Notice of Emergency Removal (form JV-324) until March 3, 2014.

Petitioner did not object to the untimely notice at the hearing three days later on March 6, 2014, nor did she at any of the various hearings following. It was not until the May 29, 2014, removal hearing, after the agency presented its case, that petitioner asked that the juvenile court dismiss the matter because the agency had failed to follow the law regarding emergency removal of Isaac and failed to meet its burden for continued removal of the child. The juvenile court denied the request.

We find petitioner is now precluded from obtaining review of this issue on appeal. (See *In re Lukas B.* (2000) 79 Cal.App.4th 1145, 1152 [failure to object to inadequate notice forfeit claim on appeal]; *In re Joseph E.* (1981) 124 Cal.App.3d 653, 657 [points not raised in trial court may not be urged for first time on appeal].) While petitioner did object in the juvenile court below, she did not do so until four months after Isaac was first removed.

In any event, under section 366.26, subdivision (n), the juvenile court must decide whether to remove the child from the home of a prospective adoptive parent regardless of whether the agency has detained the child on an emergency basis or seeks to remove a child who remains in the home pending the outcome of the hearing. (*State Dept. of Social Services v. Superior Court, supra,* 162 Cal.App.4th at pp. 285-286.) Thus, with the exception of the notice requirements, the same hearing procedures apply to both types

---

[5]     Petitioner incorrectly cites to section 366.26, subdivision (n)(3) instead of (n)(4).

16

of removal and the child may not be removed from the designated prospective adoptive parent unless the juvenile court finds that removal is in the child's best interests. (*Ibid.*) We have found sufficient evidence supports the juvenile court's finding that removal of Isaac was in his best interest, and we need not address petitioner's notice argument further.

## DISPOSITION

The petition for extraordinary writ is denied.