Filed 2/8/16  Lydia M. v. Superior Court CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| LYDIA M., | D069181 |
| Petitioner, | |
| v. | (San Diego County Super. Ct. No. NJ13677B-C) |
| THE SUPERIOR COURT OF SAN DIEGO COUNTY, | |
| Respondent; | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY et al., | |
| Real Parties in Interest. | |

ORIGINAL PROCEEDINGS in mandate.  Michael J. Imhoff, Commissioner.

Petition denied.

Terence M. Chucas, under appointment by the Court of Appeal, for Petitioner.

No appearance by Respondent.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Lisa M. Maldonado, Deputy County Counsel, for Real Party in Interest San Diego County Health and Human Services Agency.

Lydia M. seeks writ review of a removal order under Welfare and Institutions Code section 366.26, subdivision (n)(3)[1] in the juvenile dependency case of her minor granddaughters Autumn L. and Amaya M. Lydia contends the court erred by finding that removing Autumn and Amaya from Lydia's home was in the minors' best interests. We conclude the evidence supports the juvenile court's order and therefore deny the petition.

FACTUAL AND PROCEDURAL BACKGROUND

Consistent with our standard of review, we state the facts in the manner most favorable to the juvenile court's order. (*In re Janee W.* (2006) 140 Cal.App.4th 1444, 1448, fn. 1.)

On November 19, 2013, the San Diego County Health and Human Services Agency (the Agency) petitioned the juvenile court under section 300, subdivision (b) on behalf of four-year-old Autumn and two-year-old Amaya. The Agency alleged that the minors' parents, Amber L. and Manuel R., were arrested after Amber drove with Amaya while under the influence of marijuana, heroin, and methamphetamines and Manuel was found in possession of drug paraphernalia. The Agency further alleged that both parents had ongoing struggles with substance abuse. The Agency concluded that Autumn and

---

[1] Further statutory references are to the Welfare and Institutions Code unless otherwise stated.

2

Amaya had suffered or were at substantial risk of suffering serious physical harm or illness as a result of their parents' inability to provide regular care.

At the minors' detention hearing, the court found the Agency had made a prima facie showing under section 300, subdivision (b) and ordered the minors detained in out-of-home care. Autumn was detained with Manuel's mother Lydia. Amaya was detained at Polinsky Children's Center, a temporary emergency shelter for children. Soon afterwards, Amaya was placed with Lydia as well. The juvenile court later sustained the allegations of the petition, removed the minors from their parents' custody, and ordered reunification services for Amber and Manuel. These services primarily included substance abuse treatment and counseling. The court found that the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) applied to this case based on Amber's membership in the Iipay Nation of Santa Ysabel.

In advance of the six-month review hearing, the Agency recommended that the court terminate Amber's and Manuel's reunification services and schedule a selection and implementation hearing under section 366.26. The Agency reported that Amber and Manuel had made little, if any, progress in their case plans. Amber participated in only four days of a residential drug treatment program before leaving. Manuel did not have any documented participation in drug treatment. Amber and Manuel were also incarcerated at various times during the review period. At the time of the Agency's report, Amber had two felony warrants outstanding and her whereabouts were unknown. Manuel was in law enforcement custody. The parents' visitation with Autumn and

3

Amaya was only sporadic, and Amber left drug paraphernalia at Lydia's home after one visit.

At the six-month review hearing, the court found that Amber and Manuel had not made substantive progress in their case plans and there was not a substantial probability that the minors would be returned to their care in the next six months. The court also found, beyond a reasonable doubt, that continued custody by the parents would likely result in serious emotional or physical damage to the minors. The court therefore terminated Amber's and Manuel's services and scheduled a selection and implementation hearing. Autumn and Amaya remained placed with Lydia. The Agency reported that placement with Lydia appeared to meet the minors' needs.

The Agency recommended a permanent plan of adoption. The Agency believed that the minors were specifically adoptable by Lydia (who wanted to adopt them) and generally adoptable based on their characteristics. The Agency noted that Manuel had visited the minors at Lydia's home without Agency supervision or authorization. An Agency social worker told Lydia that she could not supervise visits between Manuel and the minors; any visits had to be coordinated through the Agency.

Prior to the selection and implementation hearing, the Agency learned that Lydia was no longer able to stay at her previous residence. She and the minors had been living in motels for approximately two months. At one motel, an Agency social worker observed used syringes and garbage on the property near their room. The room did not have a refrigerator or cooking appliance. The Agency concluded it was not a suitable environment for the minors. The Agency informed the court it was pursuing other

4

placements for the minors. Within two months, Lydia moved with the minors into the home of her sister, paternal great-aunt Elvira P. The Agency reported that Elvira's home was appropriate and it had "no concerns" with that placement.

At the selection and implementation hearing, the juvenile court found that Autumn and Amaya were likely to be adopted and no exception to adoption applied. The court could not find, however, that Autumn and Amaya were specifically adoptable by Lydia. The court explained, "I know [Lydia] has had a lot of challenges, but at this point in time her circumstances remain fluid. And in order for there to be an approved adoptive home, there would need to be a lot more stability demonstrated." The court terminated Amber and Manuel's parental rights and referred Autumn and Amaya to the Agency for adoptive placement.

Five months after the hearing, the Agency notified the court of its intent to remove Autumn and Amaya from Lydia's care. The Agency reiterated its prior concerns regarding Lydia's housing situation. Although the situation had improved at Elvira's home, the Agency had new concerns, including Lydia's failure to register Autumn for school on time and her loss of Autumn's and Amaya's vital documents (birth certificates, social security cards, and placement agreements). The Agency was also concerned that Lydia allowed Manuel to see Autumn and Amaya, despite the fact that Manuel and Amber were not allowed such informal visits given their unaddressed substance abuse issues. The Agency believed that Manuel visited the minors on a "nearly daily basis without informing the social worker." The Agency recounted one recent incident when Manuel and Amber took Autumn from her babysitter and drove her to school without

5

Lydia's consent or any supervision. The Agency reported that the minors' court-appointed special advocate (CASA) shared the Agency's concern that Lydia could not provide a safe environment and supported a change in placement. In a later report, the Agency stated that Elvira supported a change in placement as well.

Lydia objected to the removal. In her objections, she denied allowing Manuel or Amber unsupervised contact with Autumn and Amaya. Lydia stated she was not "currently" allowing contact between the birth parents and Autumn and Amaya. She claimed she told her babysitter not to allow contact between the birth parents and Autumn and Amaya, but the babysitter allowed contact without Lydia's knowledge or permission. Lydia stated she was aware of the risk Manuel and Amber posed to the minors and had fired her babysitter. Lydia also requested designation as Autumn and Amaya's prospective adoptive parent, which the court granted.

The court set an evidentiary hearing on the Agency's request to change placement. At the hearing, the court received into evidence the Agency's notices of intent, Lydia's objections, and an Agency addendum report. The court also heard testimony from an Agency social worker, Lydia, and Elvira.

The Agency social worker, Andrea Scott, testified about the Agency's concerns surrounding the minors' placement with Lydia. Scott testified regarding the birth parents' unsupervised contact with Autumn (picking her up from Lydia's babysitter) and the concerns the Agency had regarding such contact. Scott said Manuel confronted Lydia following this contact and told her, "These are my kids, and I'll do anything I damn well please." Given this comment, Scott did not have confidence that a restraining order

6

would adequately protect the minors. Scott also testified about an earlier incident when Lydia allowed supervised contact between the minors and Manuel in her home. Scott went over the Agency's other concerns, including Lydia's late registration of the minors at school, her failure to request an individual educational program (IEP) for Autumn, her failure to keep the Agency informed of important developments, and her loss of the minors' vital documents. Scott testified that Lydia was only in the very beginning stages of adoption and no adoption placement papers had been signed.

Lydia testified regarding her relationship with the minors and her assessment of the Agency's concerns. She said she had cared for the minors even before the dependency case began: Autumn since she was born, and Amaya since she was six months old. Lydia admitted she allowed supervised contact between the minors and Manuel once in the past 90 days. Lydia denied allowing any unsupervised contact. Lydia said her babysitter took Autumn to Manuel without authorization; Manuel then took Autumn to school with Amber. When Lydia found out, she "freaked out" and tried to contact Manuel. When she could not contact him, she went to Autumn's school. Manuel, Amber, and Amber's boyfriend were there dropping off Autumn. Lydia said she yelled at Manuel and told him she would call the police if he "went for the girls again." However, Lydia allowed Manuel to see the minors again several weeks later. Lydia testified, "I didn't think there was anything wrong with it."

Lydia testified that she would not let the birth parents come around in the future and she was willing to change her phone number or move to avoid them. Lydia said she would call the police if Manuel asked to see the minors. Lydia acknowledged that

7

Manuel had a substance abuse problem, but she said she did not believe he was a risk to the minors. She testified, "He uses drugs and that, but I know he won't harm the girls."

Elvira testified that Manuel had contact with the minors "a few times" during the last 90 days. She had concerns about the birth parents having contact with the minors, and she had expressed those concerns to the Agency. Elvira said she would be willing to call the police if Manuel came to her home. But Elvira reported working long hours during the day, both cleaning houses and at a department store. She was generally away from home most of the week. When she was asked whether Manuel was a danger to the minors when under the influence of drugs or alcohol, Elvira responded, "No. I don't think so. I can't say for sure yes, but I don't think so."

After hearing argument from counsel, the juvenile court concluded that it would be in the best interests of the minors to grant the Agency's request to remove them from Lydia's care. The court acknowledged it was making its finding "with a heavy heart" and stated, "This is truly a terribly difficult case to balance." The court focused primarily on the reported contact between Manuel and the minors, which the court felt posed a significant risk of danger. The court did not believe Lydia understood the risks associated with Manuel's drug use. The court said, "In her objection to removal, there's a very clear statement that she's aware of the risks. But when she testified . . . I do believe that there's a great shortfall from that statement in her paperwork from what she testified to, not only in terms of the substance of her testimony, but observing her demeanor and other factors." The court emphasized the cumulative aspect of the Agency's concerns: "The instability; the constant disruption or frequent disruption by the [birth] parents, the

8

father, in particular; the lack of evidence that [Lydia] access[es] support network[s] such as the social worker, CASA, or minor[s'] counsel; [and] the sharing of information in periods of time of instability." The court also credited the opinions of the Agency social worker, the CASA, and the minors' counsel and guardian ad litem, who supported removal.

Following the hearing, the Agency removed the minors from Lydia's care and placed them in a licensed foster home. Lydia filed the instant petition under section 366.28 and the California Rules of Court, rules 8.454 and 8.456. This court issued an order to show cause, and these proceedings followed.

DISCUSSION

The change in placement here is governed by section 366.26, subdivision (n)(3). Among other provisions, that statute requires a social services agency to notify a designated prospective adoptive parent (or a caretaker who would meet the threshold criteria for such designation) if the agency intends to remove a dependent minor from the parent or caretaker's care. (*Ibid.*) The designated prospective adoptive parent or caretaker may file a petition objecting to the removal. (*Id.*, subd. (n)(3)(A).) If the petition is filed by a caretaker, the caretaker may also file a petition for an order designating the caretaker as a prospective adoptive parent. (*Ibid.*)

"When a petition objecting to removal is filed, the juvenile court must conduct a hearing on the petition, and any related petition for designation as a [prospective adoptive parent] . . . ." (*Wayne F. v. Superior Court* (2006) 145 Cal.App.4th 1331, 1339.) "At the hearing, the court shall determine whether the caretaker has met the threshold criteria to

9

be designated as a prospective adoptive parent . . . , and whether the proposed removal of the child from the home of the designated prospective adoptive parent is in the child's best interest, and the child may not be removed from the home of the designated prospective adoptive parent unless the court finds that removal is in the child's best interest." (§ 366.26, subd. (n)(3)(B).) The court must make its best interest finding by a preponderance of the evidence. (*T.W. v. Superior Court* (2012) 203 Cal.App.4th 30, 45.)

"In determining best interest, the court must consider the minor's current circumstances. [Citation.] It is well recognized that dependency proceedings, despite statutory guidelines, may be protracted and, when delays occur, it is likely that the circumstances of the case change." (*State Dept. of Social Services v. Superior Court* (2008) 162 Cal.App.4th 273, 286.) "The concept of best interest 'is an elusive guideline that belies rigid definition. Its purpose is to maximize a child's opportunity to develop into a stable, well-adjusted adult.' [Citations.] A primary consideration in determining the child's best interest is the goal of assuring stability and continuity of care." (*Id.* at pp. 286-287.)

The parties agree we review the juvenile court's determination of the minors' best interests for substantial evidence. " 'Substantial evidence is evidence that is "reasonable, credible, and of solid value"; such that a reasonable trier of fact could make such findings. [Citation.] [¶] It is axiomatic that an appellate court defers to the trier of fact on such determinations, and has no power to judge the effect or value of, or to weigh the evidence; to consider the credibility of witnesses; or to resolve conflicts in, or make inferences or deductions from the evidence. We review a cold record and, unlike a trial

10

court, have no opportunity to observe the appearance and demeanor of the witnesses. [Citation.] "Issues of fact and credibility are questions for the trial court." [Citations.] It is not an appellate court's function, in short, to redetermine the facts.' [Citation.] Under the substantial evidence rule, we 'must accept the evidence most favorable to the order as true and discard the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact.' " (*In re S.A.* (2010) 182 Cal.App.4th 1128, 1140.) " 'The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record.' " (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1394.) "The appellant [or petitioner] has the burden of showing the finding or order is not supported by substantial evidence." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947 (*L.Y.L.*).)

The juvenile court could reasonably find that Lydia did not recognize the significant risks Manuel's and Amber's untreated substance abuse posed to the minors and did not do enough to ensure the minors' safety. Lydia allowed Manuel to contact the minors, contrary to the Agency's instructions, and did not adequately discourage Manuel from doing so in the future. The Agency believed this contact occurred "on a nearly daily basis" and that Lydia may have allowed unsupervised contact as well. Elvira expressed concern about contact between Manuel and the minors, and she told the Agency she supported removal. Lydia's history of allowing contact between the minors and Manuel, including after the admitted unsupervised contact with Autumn, showed that Lydia could not adequately protect them.

The evidence also showed other deficiencies in Lydia's ability to properly care for the minors, including her past unsettled housing situation, her inability to promptly

11

register the minors for school, her failure to pursue an IEP for Autumn, her loss of the minors' vital documents, and her failure to keep the Agency informed of important developments. Based on this evidence, the juvenile court could reasonably find that Lydia was not providing a stable and secure home environment for the minors.

The Agency social worker, the CASA, the minors' counsel, and (per the Agency's report) Elvira all supported removal. Given the evidence in the record, the juvenile court could credit these opinions and reasonably find that removal was in the minors' best interests. Substantial evidence supports the juvenile court's order.

Lydia points to her long history of caring for the minors, their bond with Lydia, and the Agency's prior comments regarding the adequacy of Lydia's care. Lydia argues that the minors will likely be traumatized by their removal. But the juvenile court was entitled to find, on this record, that the emotional discomfort the minors may feel was outweighed by the security and stability a new placement would offer, including new caretakers who recognized the significant physical and emotional risks posed by the birth parents' untreated drug abuse and who would protect the minors from those risks.

Lydia contends her actions, including her reaction to Autumn's unsupervised contact with the birth parents, show she can protect the minors from Manuel and Amber. As we have explained, however, the evidence—including the fact that Lydia allowed Manuel to contact the minors *after* this incident—supports the opposite conclusion. Similarly, Lydia contends there are reasonable explanations for her failure to pursue an IEP for Autumn and keep the Agency informed of important developments. On this record, however, the juvenile court could reasonably find these failures supported its

12

conclusion that Lydia did not provide a safe and stable home for the minors. If the evidence reasonably supports the juvenile court's order, this court cannot substitute its judgment for that of the juvenile court even if the evidence would also support the opposite conclusion. (*L.Y.L., supra*, 101 Cal.App.4th at p. 947.)

DISPOSITION

The petition is denied.

McCONNELL, P. J.

WE CONCUR:

McDONALD, J.

IRION, J.