[No. C057419. Third Dist. Apr. 23, 2008.]

STATE DEPARTMENT OF SOCIAL SERVICES et al., Petitioners, v. THE SUPERIOR COURT OF SISKIYOU COUNTY, Respondent; D.P. et al., Real Parties in Interest.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts II and III of the Discussion.

## COUNSEL

Edmund G. Brown, Jr., Attorney General, Douglas Press, Assistant Attorney General, Julie Weng-Gutierrez and Christine M. Murphy, Deputy Attorneys General, for Petitioner State Department of Social Services.

Frank J. DeMarco, County Counsel, Dennis Tanabe, Paula L. Baca and JoAnn Bicego, Deputy County Counsel, for Petitioner Siskiyou County Human Services Department.

No appearance for Respondent.

Leslie A. Salem, under appointment by the Court of Appeal, for Real Parties in Interest Minors.

Richard Stamper for Real Parties in Interest Prospective Adoptive Parents.

## OPINION

**HULL, J.**—In this matter we are required to decide whether the juvenile court has the authority to order dependent children returned to the home of designated prospective adoptive parents when, after a hearing held to determine whether the removal of a child from the home of prospective adoptive parents is in the minors' best interest (Welf. & Inst. Code, § 366.26, subd. (n); all following unspecified statutory references are to the Welfare and Institutions Code), the court is of the opinion that an emergency removal occurring some three months earlier was in the minors' best interests but that events that have occurred since the removal justify returning the minors to the designated prospective adoptive parents' home.

We hold the juvenile court has that authority.

 We also hold that section 361.4, which limits the placement of a minor who has come within the jurisdiction of the juvenile court as a dependent child, does not limit the juvenile court's discretion to order a minor returned to prospective adoptive parents after a hearing held pursuant to section 366.26, subdivision (n).

Petitioners, State Department of Social Services, Adoption Services Bureau (DSS) and Siskiyou County Human Services Department (HSD), seek a posttermination extraordinary writ (Cal. Rules of Court, rule 8.456) to vacate the orders of the juvenile court. We deny the petition.

FACTS AND PROCEEDINGS

The prospective adoptive parents, Mr. and Mrs. Y., were longtime foster parents who had foster parented several challenging teenage boys, ultimately adopting three of them. The Y.'s were viewed by the agencies with which they dealt as committed to the children placed in their care and able to deal with the sometimes serious behavioral challenges those children presented. The Y.'s also stayed in touch with their former foster children and continued to be supportive of them.

In May 2005, the HSD placed the minors T.P. and D.P., then ages 2 and 4, respectively, with the Y.'s. This was the minors' fourth placement since their removal from parental custody in November 2003, following a failed family maintenance plan. Because the Y.'s had expressed an early interest in adopting the minors, DSS did an adoption assessment prior to the minors' placement with the Y.'s and updated the assessment shortly thereafter.

It appeared to DSS that the Y.'s were following good parenting practices and were capable of meeting the minors' needs. The Y. family included a teenage biological daughter, two teenage children in guardianship, and three foster sons, whose adoptions by the Y.'s were being finalized. DSS recommended adoption by the Y.'s as a permanent plan for the minors.

The minors adjusted well to their placement with the Y.'s, and showed behavioral problems only in relation to visits with their mother. DSS believed that removal from the Y.'s home would be detrimental to the minors.

The rights of the minors' biological parents were terminated in August 2005 and the minors remained with the Y.'s while the minors' biological mother pursued an appeal of the order terminating her parental rights.

The minors continued to do well in the Y.'s home. Both D.P.'s lying and stealing and T.P.'s crying and night terrors diminished due to the Y.'s active intervention. The status review reports stated that the permanent plan continued to be adoption by the Y.'s and that the adoption process had begun. DSS expected the adoption placement and finalization to occur by the end of 2006.

The trial court conducted a status review hearing on March 12, 2007. A report filed in anticipation of that hearing stated the adoptive placement had been made and that an adoption finalization hearing was pending. By the time of the March 12 hearing, the Y.'s had voluntarily ended their foster parent certification, apparently because D.P.'s and T.P.'s placement had by that time become an adoptive placement. The minors continued to thrive in the Y.'s home. The court reviewed the minors' status and set a further status review hearing for August 27, 2007.

On August 23, 2007, because of "new developments," HSD requested that the August 27 status hearing be continued to September 10, 2007, "to allow time for the social worker to prepare a report with the most current information."

On August 27, 2007, the court granted to the minors the right to file a petition under section 366.26, subdivision (n) and continued the status hearing to September 17, 2007.

On September 13, 2007, HSD filed a status review report with attached DSS reports. Also on September 13, 2007, and pursuant to section 366.26, subdivision (n), the Y.'s formally requested a hearing on the matter of the removal of the minors from their home and the court set a contested status review hearing for September 28, 2007.

On September 28, 2007, DSS filed an addendum to the case progress report that included law enforcement and social worker investigative reports.

Taken together, the September 13 and September 28, 2007 reports revealed that the minors were removed from the Y.'s home in August 2007, placed in respite care, and then placed in a foster home. According to the reports, finalization of the adoption was postponed in March 2007, due to an incident of physical abuse of 15-year-old J.Y., one of the adopted children. Family preservation services were provided to the Y.'s, however, due to new allegations of physical abuse of 11-year-old A.Y. in August 2007 when Mr. Y. used a belt to spank A.Y. At that point, DSS removed D.P. and T.P. from the Y.'s home.

This latter incident, involving the use of a belt, led to interviews with various individuals including the Y.'s, who said that corporal punishment was part of the discipline plan used in their home after a child has been adopted. When D.P. and T.P. were interviewed, they said they had been spanked with a hand, a spoon, and a belt. The report concluded that, due to the "concerning

behaviors" of the family, a new prospective adoptive home would be located for the minors. Law enforcement and social worker reports regarding the two incidents were attached to the DSS report.

The law enforcement reports attached as addenda to the September 24, 2007 report included a police report filed as a result of the March incident, which stated that Mr. Y. reported he struck J.Y. twice during an altercation. J.Y. sustained visible injuries. Officers interviewed the other minors in the home. Three of the minors reported that spankings did occur in the home but they felt comfortable remaining there. One other minor, who took the younger boys out of the home during the altercation, reported having been slapped in the face by Mr. Y. in October 2006 and that he and others in the home were pushed occasionally when Mr. Y. got angry. D.P. told the officer he had never been pushed but had been spanked on the bottom for not obeying.

An investigative report from the Shasta County Department of Social Services regarding the March 2007 incident, also attached as an addendum, stated that the other minors were in the home at the beginning of the altercation and the youngest, T.P., was "tripped over" during the incident. The report noted Mr. Y. was remorseful and accepted responsibility for his conduct. The report further stated that the minors were generally disciplined in an appropriate manner, including occasional spankings on the buttocks. As a result of the incident and a team meeting, A.Y. was allowed to return to the Y.'s home, a safety plan was developed and voluntary services were offered to and "readily" accepted by the family. It was noted that future options, presumably as to A.Y., if necessary, included placement in a juvenile correctional institution or in a treatment foster home. The report recommended closing the referral and opening a voluntary case, noting the abuse allegation was substantiated as was the risk of abuse to the minors T.P. and D.P.

A Lane County, Oregon, Sheriff's Office report dated August 17, 2007, was prepared after a request by HSD to investigate a report of a possible beating of the Y.'s adopted son, A.Y. When interviewed, A.Y. reported he had been hit with a belt by Mr. Y. a few days earlier, while on a camping trip, for "backtalking" Mrs. Y. A.Y. said Mr. Y. hit him with a belt approximately 10 times while Mrs. Y. helped hold him. A.Y. had bruises on his upper legs and arms and scratches on his knees and shins. A.Y. told the deputy the scratches were from falling down and the bruises may have been from falling or from the belt. A.Y. was unaware of some of the bruises on his arms until the

deputy pointed them out and A.Y. did not know what, if any, bruises on his legs were caused by being hit with the belt. A.Y. also told the deputy he was spanked a couple of times a month either with a belt, an open hand, or a spoon. A.Y. said everything was fine at home adding with a smile that he did not like being spanked.

The contested status hearing began September 28, 2007. Additional testimony was taken in October 2007, and the hearing concluded November 16, 2007, three months after DSS removed the minors from the Y.'s home.

During the hearings the following evidence was presented.

The DSS adoption specialist testified the minors were removed because of the abuse of J.Y. in March coupled with the fact that the anger management classes and support services for the Y.'s did not appear to have resulted in a change in the use of corporal punishment by the Y.'s. Such a change should have prevented the second incident in August 2007 but did not, thereby placing the minors at continued risk, thus, removal was in their best interests. He stated that Shasta County, where the Y.'s lived, independently investigated the August incident and found the evidence inconclusive for child abuse. The adoption specialist acknowledged none of the children in the home were removed after the March incident and that the issue of spanking never came up in March. The specialist testified that spanking could constitute corporal punishment, which the witness defined as physically harming a child.

None of the children were detained by law enforcement or Shasta County after investigation of the August incident, and DSS removed only D.P. and T.P.

The adoption specialist said that spanking does not disqualify a family for adoption if it is appropriate in severity and type. According to the adoption specialist, when parents agree to adopt, they sign various documents, including the adoption placement agreement, but none of the documents discusses the question of discipline in the home.

On the other hand, the earlier home study included a questionnaire, which asks questions about methods of discipline. The Y.'s had disclosed in the evaluation questionnaire for the home study that they used spanking and the DSS practice was to follow up with questions to be sure the discipline methods fit the profile of the type of family they were looking for. DSS did not want to place a child in a home where a spanking was accomplished with

a belt. However, the adoption specialist was unwilling to say any belt use was too much, although he felt there was a difference between spanking with and without a belt. He also testified spanking with a belt was excessive and would justify removal and that any degree of hitting would concern him and would have to be considered when placing a child.

After the minors were removed from the Y.'s home, the specialist discussed the spanking question with the Y.'s—who did not know that DSS disapproved of spanking their adopted children—and informed the Y.'s that it was not acceptable to DSS for them to spank the children.

The adoption specialist stated this family's strength was its ability to work with difficult behavior in adolescent boys and to advocate for them. He testified the minors are attached to the Y.'s and have asked to go home. He also stated that in the first two months after removal, the minors had been in four different placements. Further, there were reports of increased acting out by the minors since their removal, for example, D.P. had regressed to lying and stealing and the minors had engaged in three acts of animal abuse, one of which made it necessary to euthanize a small dog they had injured.

The HSD social worker testified she spoke to the Y.'s in April 2007, explaining it was against foster care rules to strike or spank a child.

The therapist who counseled the Y.'s and their three adopted boys testified she knew spanking was used in the home and while she disapproved of the practice, she was aware that it was not always harmful and had not been harmful in this family. She recommended the minors be returned to the Y.'s home because of the quality of support and care they provided to children in their home and because there had been no spanking since the minors were removed. She testified that Shasta County did not find the August incident substantiated because they could not establish whether or not A.Y.'s bruises resulted from the belt or from playing.

N.P., a 19 year old who had lived with the Y.'s in a voluntary placement, testified he was spanked but never beaten when he lived there. He testified that A.Y. tried to hurt himself when agitated and restraints were used to calm A.Y. but that A.Y. had improved over time. He had seen the Y.'s spank D.P. and T.P., by a "pop on the butt" with a hand to send the minor to a timeout.

T.H., an 18 year old who lived in the Y.'s home under guardianship, was present during the August incident. She testified A.Y. was out of control,

biting himself, not responding to Mr. Y. telling him to calm down, and was hit only two or three times, not 10 times as reported. Mrs. Y. was touching A.Y. but not holding him down. She further testified that D.P. and T.P. were not spanked as foster children but had been swatted on the "butt" on rare occasions after the adoptive placement had been made.

S.D., Mrs. Y.'s biological child, also observed the August incident and agreed with the testimony of T.H. that A.Y. had not been hit 10 times and did not have marks from being hit with a belt.

Mrs. Y. testified that a range of disciplinary techniques were used in the home, including restraint to keep A.Y. from hurting himself and spanking of adopted children. She identified documents they had signed notifying them not to spank foster children and they had not spanked D.P. and T.P. until after they were in adoptive placement. She had never been informed that spanking was not appropriate until after the adoption was final. She stated spanking had not been used since the minors' removal and would not be used in their home again. She did not feel it would be a problem since they had not used spanking with foster children, only with those who were adopted.

Mrs. Y. testified that the HSD social worker addressed the issue of domestic violence but not the question of spanking when they talked in April 2007. Although both D.P. and T.P. had some behavioral problems initially, they had improved over time and neither had hurt animals while in their care. After the animal abuse incidents, DSS asked her to work with the minors to discover what had happened and she did so.

At the October 2007 hearing, Mr. Y. testified he completed an anger management class after the March incident. He admitted he had spanked D.P. and T.P. after the adoptive placement took place because he believed it was not illegal. He stated he would not use spanking as a punishment again because the law and definitions regarding its use were not clear. The court questioned Mr. Y., stating that, from Mr. Y.'s responses, the court sensed Mr. Y. did not totally embrace the thought that corporal punishment was an inappropriate way to discipline children. Mr. Y. responded that he was raised to believe that spanking was permissible but that if the laws and definitions had changed, he had to change too and that spanking was no longer an option for him.

At the November 2007 hearing, Theresa Steirs, an independent investigator who had a background in social work in HSD, testified she initially agreed with DSS's decision to remove the minors, but, after investigating the family,

felt the only issue that stood in the way of returning the minors was the use of corporal punishment. Following the last court hearing and considering the testimony that corporal punishment was part of the Y.'s core belief system, she believed the Y.'s needed more information and suggested they educate themselves on the issue. They did so, finding various materials, which they summarized in discussions with her. After talking with the Y.'s, she concluded they had internalized the information and now understood how damaging corporal punishment could be, even advocating against its use. She believed that it was safe for the minors to return and that they should do so. She had also spoken to the supervisor of voluntary services in Shasta County, who was of the opinion the Y.'s had made great progress and was supportive of returning the minors to their care.

Mr. Y. again testified, stating that no one before Steirs told them to learn about corporal punishment and its effects. He noted that the judge had said he had not grasped the concepts and he now agreed after having studied the issue and learned that it was "not okay to hit a child." Mr. Y. also testified he was working with the anger management therapist to further his understanding of the negative effects of corporal punishment.

After hearing argument, the court tentatively ruled that in August 2007, the minors' removal was justified, however in the interim, circumstances had changed and it was now in the best interests of the minors to return to the Y.'s home. Following further argument, the court adopted its tentative ruling. Petitioners requested a stay of the order, which was denied.

DISCUSSION

I

*The Scope of the Facts to Be Considered by the Trial Court*

Petitioners contend the juvenile court erred when the court based its ultimate ruling concerning permanent removal on the facts as they appeared at the conclusion of the hearings and argues the trial court should have ruled on whether permanent removal was in the best interests of the minors based only on facts existing at the time of the removal.

We should put this issue in historical context. Originally, DSS and adoption agencies had discretion to remove and place adoptable children whose parents' rights had been terminated *as the agencies wished*, subject only to juvenile court review of the agency's decision for an abuse of discretion.

(*Department of Social Services v. Superior Court* (1997) 58 Cal.App.4th 721, 734 [68 Cal.Rptr.2d 239].) Then came *In re Harry N.* (2001) 93 Cal.App.4th 1378 [114 Cal.Rptr.2d 46] (*Harry N.*). There, an agency decision to remove the minor from his prospective adoptive parents in California, with whom he had lived most of his life, and to place him with paternal relatives in Puerto Rico resulted in protracted litigation in both the juvenile and appellate courts, which adversely affected the child's need for a stable and permanent family relationship.

■ In response to *Harry N.*, the Legislature enacted two significant revisions to the dependency statutes. (As to those revisions, we take judicial notice of the Sen. Com. on Judiciary, Analysis of Sen. Bill No. 59 (2003–2004 Reg. Sess.) and of the Sen. and Assem. Coms. on Judiciary Analyses of Sen. Bill No. 218 (2005–2006 Reg. Sess.). (See *In re J. W.* (2002) 29 Cal.4th 200, 211 [126 Cal.Rptr.2d 897, 57 P.3d 363] ["To determine the purpose of legislation, a court may consult contemporary legislative committee analyses of that legislation, which are subject to judicial notice."].))

The first legislative revision was intended to meet the concern that litigation can significantly and, for the minor, detrimentally delay the determination of a final adoption placement. Enacted in 2003, section 366.28 took the modified writ procedure used to review orders setting section 366.26 selection and implementation hearings, and extended it to the review of "an order by the court that a dependant child is to reside in, be retained in, or be removed from a specific placement." (§ 366.28, subd. (b)(1); see Stats. 2003, ch. 247, § 1; Sen. Com. on Judiciary, Analysis of Sen. Bill No. 59 (2003–2004 Reg. Sess.) as amended Mar. 18, 2003, p. 2; Cal. Rules of Court, rule 8.452.) This is the procedure used by petitioners here to review the juvenile court's decision in this matter.

The second revision to the dependency statutes came in 2005, when the Legislature enacted subdivision (n) of section 366.26 (Stats. 2005, ch. 626, § 1; Sen. Com. on Judiciary, Analysis of Sen. Bill No. 218 (2005–2006 Reg. Sess.) as amended Apr. 21, 2005, pp. 4–5; Assem. Com. on Judiciary, Analysis of Sen. Bill No. 218 (2005–2006 Reg. Sess.) as amended Jun. 2, 2005, p. 5), which subdivision provides for a hearing to review an agency's decision to remove a child from the home of a prospective adoptive parent. The addition of subdivision (n) to section 366.26 was intended to address a legislative concern that an unjustified agency action removing a minor from a long-term caregiver might not be in the child's best interest.

Section 366.26, subdivision (n), provides in relevant part: "(3) Prior to a change in placement and as soon as possible after a decision is made to remove a child from the home of a designated prospective adoptive parent,

the agency shall notify the court, the designated prospective adoptive parent . . . , the child's attorney, and the child, if the child is 10 years of age or older, of the proposal . . . .

"(A) Within five court days or seven calendar days, whichever is longer, of the date of notification, the child, the child's attorney, or the designated prospective adoptive parent may file a petition with the court objecting to the proposal to remove the child, or the court, upon its own motion, may set a hearing regarding the proposal. The court may, for good cause, extend the filing period. . . .

"(B) A hearing ordered pursuant to this paragraph shall be held as soon as possible and not later than five court days after the petition is filed with the court or the court sets a hearing upon its own motion, unless the court for good cause is unable to set the matter for hearing five court days after the petition is filed, in which case the court shall set the matter for hearing as soon as possible. At the hearing, the court shall determine . . . whether the proposed removal of the child from the home of the designated prospective adoptive parent is in the child's best interest, and the child may not be removed from the home of the designated prospective adoptive parent unless the court finds that removal is in the child's best interest. . . . [¶] . . . [¶]

"(4) Notwithstanding paragraph (3), if the State Department of Social Services or a licensed adoption agency determines that the child must be removed from the home of the caretaker who is . . . a designated prospective adoptive parent immediately, due to a risk of physical or emotional harm, the agency may remove the child from that home and is not required to provide notice prior to the removal. However, as soon as possible and not longer than two court days after the removal, the agency shall notify the court, the caretaker who is . . . a designated prospective adoptive parent, the child's attorney, and the child, if the child is 10 years of age or older, of the removal. Within five court days or seven calendar days, whichever is longer, of the date of notification of the removal, the child, the child's attorney, or the caretaker who is . . . a designated prospective adoptive parent may petition for, or the court on its own motion may set, a noticed hearing pursuant to paragraph (3)."

 As can be seen, section 366.26, subdivision (n) details a procedure for judicial review of both emergency and nonemergency removals from a designated prospective adoptive parent. (§ 366.26, subd. (n)(3), (4).) With the exception of the notice requirements, the same hearing procedures apply to both types of removal and, in each case, the agency "must prove by a preponderance of the evidence that the removal is in the best interest of the child." (Cal. Rules of Court, rule 5.728(f); see also *id.,* rule 5.727(g).)

Further, "the child may not be removed from the home of the designated prospective adoptive parent unless the court finds that removal is in the child's best interest." (§ 366.26, subd. (n)(3)(B); see also *id.*, subd. (n)(4).) Thus, the statute represents a paradigm shift in the standards to be applied to agency decisions in the narrow category of posttermination removal of children from designated prospective adoptive placements and gives to the court the wide discretion previously afforded the adoption agencies to determine whether the placement is in the best interest of the child. (*Wayne F. v. Superior Court* (2006) 145 Cal.App.4th 1331, 1341 [52 Cal.Rptr.3d 519].)

In this matter petitioners argue that once the court found the emergency removal was in the minors' best interest given the facts at the time of the removal, inquiry into the situation in the home after the removal was inappropriate and that evidence of either the status of the minors or the Y.'s rehabilitation after the emergency removal was not relevant to the issue before the court. We disagree.

■ First, nothing in subdivision (n) says that proof at the hearing is limited to the facts in place at the time of the emergency removal. (§ 366.26, subd. (n).) The statute says only that the court must determine "whether the proposed removal of the child from the home of the designated prospective adoptive parent is in the child's best interest" and emphasizes that "the child may not be removed from the home of the designated prospective adoptive parent unless the court finds that removal is in the child's best interest." (§ 366.26, subd. (n)(3)(B); see *People v. Snook* (1997) 16 Cal.4th 1210, 1215 [69 Cal.Rptr.2d 615, 947 P.2d 808] [in construing a statute, the plain meaning of the words are controlling].)

■ In determining best interest, the court must consider the minor's current circumstances. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 322 [27 Cal.Rptr.2d 595, 867 P.2d 706].) It is well recognized that dependency proceedings, despite statutory guidelines, may be protracted and, when delays occur, it is likely that the circumstances of the case change. (*In re Marriage of Carney* (1979) 24 Cal.3d 725, 741 [157 Cal.Rptr. 383, 598 P.2d 36]; *In re S. D.* (2002) 99 Cal.App.4th 1068, 1083 [121 Cal.Rptr.2d 518]; *In re Arturo A.* (1992) 8 Cal.App.4th 229, 244–245 [10 Cal.Rptr.2d 131]; see also *In re Rocco M.* (1991) 1 Cal.App.4th 814, 824 [2 Cal.Rptr.2d 429] [jurisdiction must be based upon circumstances at the time of the hearing].)

The concept of best interest "is an elusive guideline that belies rigid definition. Its purpose is to maximize a child's opportunity to develop into a stable, well-adjusted adult." (*Adoption of Michelle T.* (1975) 44 Cal.App.3d 699, 704 [117 Cal.Rptr. 856]; see also *In re Ethan N.* (2004) 122 Cal.App.4th

55, 66 [18 Cal.Rptr.3d 504].) A primary consideration in determining the child's best interest is the goal of assuring stability and continuity of care. (*In re Stephanie M., supra,* 7 Cal.4th at p. 317.) This can occur only by considering all the evidence available to the court at the time the court makes its decision regarding removal of the child.

At oral argument, DSS made it plain that, in its view, the juvenile court only had the authority to determine whether the emergency removal was in the best interest of the child at the time of the removal and that, once the court determined that the initial removal was appropriate, it was solely up to DSS to decide where the child would be placed thereafter. The obvious difficulty with that argument is that it would return the juvenile dependency law to the days of *Harry N.* and allow once again for protracted litigation that is not in the best interest of the child. That is exactly the situation the Legislature sought to remedy when it changed the law in 2003 and 2005 as noted earlier in our opinion.

■ Because the Legislature established the standard to be applied in removing minors from designated prospective adoptive parents as that which is in the best interest of the child, we conclude that the court not only may, but should, consider both the facts that led to the emergency removal and evidence of the minor's and the prospective adoptive parents' circumstances up to and including the point in time when the court decides whether the removal should be made permanent. The juvenile court has the discretion to decide that the emergency removal was justified, but that circumstances at the time of the hearing are such that it is in the best interests of the minor to return to the prospective adoptive parents. Any other interpretation would ignore the plain legislative intent in enacting section 366.26, subdivision (n).

Accordingly, the juvenile court's preliminary finding that, had it ruled in August when the emergency removal occurred, it would have found the removal to be in the minors' best interests, did not prevent the court from considering evidence adduced over the next three months of the minors' and the Y.'s current circumstances in determining whether the removal from the home ultimately was in the best interests of the minors.

II, III*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 273.

## DISPOSITION

The petition is denied.

Scotland, P. J., and Blease, J., concurred.