Filed 3/21/16  S.S. v. Superior Court CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| S.S. et al.,<br><br>        Petitioners,<br><br>v.<br><br>THE SUPERIOR COURT OF CONTRA COSTA COUNTY,<br><br>        Respondent;<br><br>CONTRA COSTA COUNTY CHILDREN & FAMILY SERVICES BUREAU et al.,<br><br>        Real Parties in Interest. | A146323<br><br>(Contra Costa County<br>Super. Ct. Nos. J13-01014 &<br>J13-01015) |

Petitioners S.S. and B.S., the former foster parents and prospective adoptive parents of D.C. and C.S., challenge the juvenile court's order that the children's removal from their care was in the children's best interests.   We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

D.C., born in November 2004, and her half-sister, C.S., born in March 2012 were placed with petitioners in late September 2013.  On February 2, 2015, the juvenile court terminated the parental rights of the mother and the respective fathers of D.C and C.S. pursuant to section 366.26.[1]

In November 2013 the Bureau reported that D.C. was meeting the developmental milestones of middle childhood—e.g., she was able to dress herself, develop friendships,

---

[1] Unless otherwise noted, all statutory references are to the Welfare and Institutions Code.

1

and exhibit good control of both large and small motor movements. She was reportedly enjoying third grade, and was described as a "parentified eight year old," who was very helpful with her younger sister.

But C.S.'s transition to foster care was "challenging." The Bureau's report opined that because C.S. had been left for extended periods of time with various care providers, it affected her ability to develop trusting relationships. Furthermore, the effects of her in utero exposure to illicit substances were unknown. Initially C.S. struggled with unfamiliar care takers. She had tantrums and repeatedly banged her head, although the foster parents reported that her behaviors were improving. C.S.'s verbal skills were limited, and it was frustrating for her to express her needs. However, the social worker observed her to be smiling and trying to communicate her desires. Although the foster parents had not reported any medical concerns, at an October 11, 2013 medical examination she was thought to have ingested a blood pressure medication, Clonidine, and/or a sleep medication, Trazodone.[2]

In its September, 2014 status review report, the Bureau indicated that D.C. was enjoying school, had a passion for academics, and was excited to begin fourth grade. She was athletic, able to express herself, and "mature beyond her years." She was, for instance, aware that although her mother had a limited time to demonstrate to the court she had stopped using drugs, she was not in a substance abuse program. D.C. was also aware that her father was unable to care for her. She did not wish to be separated from C.S. She attended counseling, but had not connected emotionally with her therapist.

By September, C.S. was described as a "healthy and active two year-old." She was meeting developmental milestones and able to express her desires and respond appropriately to questions. But she was having difficulties manifested by biting and crying. When her sister, D.C., was nearby C.S. wanted her constant attention. The Bureau had granted a waiver allowing C.S. to sleep in her foster parents' room because her treating pediatrician believed that was in her best interests. When her foster parents

_____

[2] The report refers to Trazodone, an antidepressant, as a "sleep aid." (See https://en.wikipedia.org/wiki/Trazodone [as of January 26, 2016].)

2

repeatedly attempted to move her to another bedroom to meet licensing requirements, C.S. "would cry and cry until she was sick." C.S. had a trusting relationship with her foster parents and relied on her foster mother for reassurance. The report stated that the foster parents were "willing and able to provide [the children] with permanence."

The Bureau's February 2015 report stated that "[D.C.] has been in a very stable placement for the past sixteen months, and the family is able and willing to adopt her. [D.C.] has also expressed her desire to be adopted by the family." C.S., it reported, "is a challenging child, [but] her prospective adoptive parents possess the experience and commitment that is required to meet her needs."

Even though reports were largely positive, on June 30, 2015, the Bureau removed both girls from petitioners' care. The removal was due to what the Bureau characterized as an "immediate risk of harm" stemming from the decertification of petitioners' foster home due to substantiated "allegations of [p]hysical abuse to a foster child and having dangerous items and firearms accessible to foster children."

There was initially some difficulty with notice which may have been compounded by the fact that petitioners' attorney was on medical leave when the forms were transmitted. However, ultimately petitioners received the appropriate notice and forms, requested de facto parent status, and objected to the emergency removal.

The juvenile court determined that under section 366.26, subdivision (n)(3), petitioners had a right to a hearing where the Bureau had the burden to establish by a preponderance of the evidence that removal of the children from their care was in the children's best interests. [3]

---

[3] Generally, section 366.26, subdivision (n) outlines the criteria for adoptive parents. Subdivision (n)(3) addresses the appropriate procedure when an agency decides to remove a child from the home of a prospective adoptive parent. Subdivision (n)(4) provides explicit authority for an agency to remove a child from a prospective adoptive parent on an emergency basis. If the prospective parents timely challenge removal, whether emergency or otherwise, the court is to inquire whether removal was in the child's best interests. (§ 366.26, subd. (n)(3) and (4).)

At the hearing, the social worker testified that the children were removed on an emergency basis when the prospective parents' foster home was decertified due to substantiated allegations of physical abuse towards another foster child[4] and the presence of a BB gun that was accessible to the children. The hearing explored whether petitioners spanked C.S., the allegation that the foster mother had bitten another child's finger and hit her thigh, and whether the foster father was "not on board with adopting [C.S.] due to [her] behavior." C.S. was reportedly kicking and slapping her foster mother, banging her head, throwing herself on the floor, hitting the dog, screaming, and having difficulty sleeping through the night.

The hearing was continued to September 11, 2015, when further testimony was elicited regarding the spanking allegation, C.S.'s affectionate relationship with the foster mother, the foster mother's efforts and/or resistance to additional therapeutic services for C.S., the allegation that a BB gun was accessible to the foster children, and the foster father's reluctance to adopt C.S. The testifying social worker reported that the worker from the Family Foster Agency, responsible for certifying the foster parents', home had been involved with this family for several years. He stated that, although the decision to remove the children from this home was very difficult, it was the best thing he had ever done. The girls were not having the same issues in the new foster home they previously had in foster care. D.C. was smiling a lot more, and C.S. had made a drastic change for the better.

The juvenile court observed that the Bureau's most recent memo stated that D.C. had adjusted well to her new foster home after her removal from the petitioners' home. She reportedly was more relaxed, comfortable and engaging. She had some questions about her biological mother, but wanted the court to hear that she was doing fine in her placement and would be fine if it became her permanent home. The new foster mother

---

[4] At the next court date, the social worker clarified her earlier testimony. The substantiated physical abuse was an alleged spanking of C.S. In addition, there were three earlier substantiated allegations that they foster parents did not follow "prudent parent requirements," that they were frequently intoxicated, and that one of them had physical altercations with their adopted child.

reported that D.C. did not mention her previous prospective parents, but did talk about places she had gone while she was in their care. The social worker never heard that D.C. requested to be returned to petitioners' home, although she did request to go there to retrieve some of her belongings.

C.S. was described as "very engaging and talkative." She followed directions and was affectionate towards her new foster mother. She was somewhat fixated on her genital area, but had stopped saying she was a naughty girl. She was now readily taking her nap and the time it took to get her to go to bed at night had been reduced by half. Similarly, her night terrors—i.e., waking up screaming and kicking—had ceased. She had tantrums and hit others less often. The social worker observed her at daycare and thought she interacted appropriately with peers and staff. When the foster mother went to work, C.S. would cry for about 15-20 seconds before she calmed down. C.S., who was previously barred from her preschool due to her behavior, was now behaving like a normal three-year-old and had stopped biting and having tantrums. The Bureau social worker reported that for the most part she was now able to understand C.S. She noted that C.S.'s "language is intelligible, but her pronunciation is not always clear."

The adoption supervisor testified that when the Bureau decided to remove the children from petitioners' home, she anticipated their behaviors would worsen and they would act out. To her surprise, they did not. D.C. did not express a desire to return to petitioners' home and C.S.'s bedtime behavior and sleep improved. These changes suggested to her that placement in petitioners' home had not been a good match.

The adoption supervisor also testified that the Bureau did not finalize the adoption before the allegations of physical abuse surfaced because of the prospective adoptive father's reluctance to adopt C.S. Since the Bureau determined that it would be in both children's best interest to finalize their adoptions simultaneously, it did not proceed with the adoptions while he remained ambivalent.

The juvenile court determined the "firearm" in the petitioners' home was a BB gun found in a desk drawer in the home office. It was the court's view that the firearm

5

allegation had no "bearing as to whether or not it was in the best interest of the child[ren] to remove them."[5]

The petitioner, foster mother S.S., also testified at the hearing. Generally, she testified about her efforts to get the children specialized medical care and have C.S. placed in an appropriate preschool program that required more in tuition than provided by her stipend. She observed slow improvement in C.S.'s behaviors at home, but C.S. had difficulty adjusting to preschool and deteriorated when the licensing agency compelled her to move out of the foster parents' bedroom. She also testified that by the time the children were removed from her care, it took her the same time to get C.S. settled down for bed as the new foster mother. Similarly, she was able to settle C.S. down for a nap in about the same amount of time the new foster mother reported it took her. She also testified that when C.S. was in her care, she did not exhibit the obsession with her genital area that was reportedly a concern of the social worker. S.S. denied ever physically abusing, hitting, or biting the girls.

S.S. described an alarm she installed on the door to C.S.'s room. She would close the door in order to motivate C.S. to behave. She also closed the door and alarmed it to keep C.S. safe at night because C.S. tended to get up and wander through the house. S.S. denied that her husband said that they were not equipped to parent C.S. Rather, she recalled that they wanted to finalize the adoption by June 2015. They did not need to wait for a psychological assessment because they had what was required to care for C.S., and her husband had more reservations about the adoption because he was a man. Explaining her comment, she said that when her husband returned from work, coping with a screaming child was difficult, but that "once [they] had permanency [they] could parent [C.S.] how [they] wanted to parent her."

---

[5] Although the court disregarded the BB gun in deciding whether the removal was in the children's best interests, it nonetheless considered it a "real danger" that could affect the licensing of petitioners' home. The court explained that even a "semiautomatic-looking BB gun," constitutes a danger when possessed by a young person.

As a preliminary matter, the juvenile court found the Bureau's witnesses, the social worker and the adoption supervisor, to be credible. On the other hand, the court found petitioner S.S.'s testimony not credible. Based on her manner the court perceived her to appear "incredibly defensive," and evasive. The court said it would "consider all the evidence and the circumstances up until today's date in determining whether or not removal is in the best interest of the children." It also acknowledged the differences between the two sisters and that D.C. did not present the same behavioral and emotional challenges that C.S. did.

The juvenile court found that the Bureau acted appropriately to remove the children, and indeed, the Bureau might have even done so earlier. While the court rejected the notion that "a slap on the bottom without leaving marks" was child abuse, the court was concerned that placing a child in a room with an alarmed door as an incentive for good behavior would be frightening to a child with a traumatic upbringing who was displaying attachment issues. The court noted that C.S. was no longer exhibiting the night terrors and screaming she had when she was in the petitioners' care. The court also based its decision on the former foster father's reluctance to adopt C.S. The court clarified that it was appropriate for the Bureau to have removed the children due to the decertification of the foster home. But the court's decision that removal was in the children's best interests was not based on the foster home decertification. Finally, the court denied petitioners' request to be granted de facto parent status because they were no longer in a position to provide information regarding the children's daily care.

On September 18, 2015, petitioners filed timely notices of intent to file a writ petition. They filed their petition on December 1, 2015, and we issued an order to show cause the following day. On December 3, 2015, petitioners requested that we stay all proceedings in the juvenile court, including an adoption review hearing that was set to take place on December 16, 2015. We denied the stay request on December 11. After opposition was filed on December 17, oral argument was deemed to have been waived.

7

**DISCUSSION**

Petitioners support their petition with four arguments: (1) the juvenile court erred by considering stale evidence unrelated to the children's removal; (2) there was no basis for the removal because the court rejected the allegation that C.S. had been physically abused and the BB gun had no bearing on the court's determination of the children's best interests; (3) no exigency justifying emergency removal of the children existed because the allegations against petitioners were based on events that had happened months before removal; and (4) the evidence did not demonstrate that the children are better off in their new home, so their removal from petitioners' home was not in their best interests.

We review a juvenile court's decision authorizing a change in a minor's placement for abuse of discretion. (*In re M.M.* (2015) 235 Cal.App.4th 54, 64.) However, the court's finding that the change is in the minor's best interests is reviewed for substantial evidence. (*Ibid.*)

I.

We will first address petitioners' challenge to the emergency removal of the children. Petitioners argue that there was no emergency because the underlying facts upon which the removal was made had been known for more than three months. When it held that the Bureau had acted appropriately in removing the children, the juvenile court acknowledged the Bureau might have acted sooner. However, it explained that the "goal is always when we have children who are adoptable and hopes of an adoption to do whatever you can to preserve that. . . ." In other words, the time the Bureau took to consider whether the safety concerns in this case should disrupt an otherwise on-track adoption was reasonable. But once a decision was made to decertify the home, there was some urgency to remove the children because petitioners no longer had a licensed home. Since there was no authorization for the children to be living there, they had to be promptly removed.

To the extent petitioners argue that the Bureau's decision to remove the children from petitioners' home on an emergency basis presents an issue separate from whether removal was in the children's best interests, they are wrong. Regardless of whether or

8

not the removal is an emergency, the court makes the same determination and considers whether the removal is in the children's best interests.  (See § 366.26, subd. (n)(3)(B) & (4).)  The Bureau is empowered to initially decide to remove a child from the home of a prospective adoptive parent.  (*In re Harry N.* (2001) 93 Cal.App.4th 1378, 1397.)  We do not separately review the Bureau's decision when children are removed on an emergency basis.

The rights of prospective adoptive parents, like petitioners, who have not previously been declared to be de facto parents are quite limited.  They are entitled to notice of the change of placement and to object to the removal—but they are not parties to the dependency proceedings.  (*R.H. v. Superior Court* (2012) 209 Cal.App.4th 364, 372.)  Our inquiry focuses exclusively on the best interests of the children.

## II.

The criteria to determine what is in a minor's "best interest" can be elusive.  (*State Department of Social Services v. Superior Court* (2008) 162 Cal.App.4th 273, 286 (*State Department*); *Adoption of Michelle T.* (1975) 44 Cal.App.3d 699, 704.)  Consequently, a " 'court should avail itself of all evidence which might bear on the child's best interest,' " and not " 'restrict or prevent testimony on formalistic grounds.' "  (*In re Emily D.* (2015) 234 Cal.App.4th 438, 446.)  Petitioners contend that the juvenile court erred by considering evidence that either did not concern the minors' removal or which pre-dated the events leading up to the removal.   They argue such evidence is irrelevant and is beyond the scope of the hearing.  But evidence is not irrelevant simply because it concerns an incident of abuse or negligence that did not immediately precede the emergency necessitating the minors' removal.  Depending on circumstances, it will often be prudent for the court to consider it, together with any countervailing evidence.

In support of their position, petitioners primarily rely on *State Department*.  But there the issue was not whether the juvenile court could consider supposedly stale evidence, but whether it could consider post-removal evidence regarding the children after their removal.  The *State Department* court explicitly approved consideration of "evidence of the minor's and the prospective adoptive parents' circumstances up to and

9

including the point in time when the court" makes its decision. (*State Department, supra*, 162 Cal.App.4th at p. 287.) The court did not suggest excluding evidence before some arbitrary point in time because it is necessarily too stale. Consistent with the court's general goal of determining a child's best interests and with the case law, we conclude the juvenile court appropriately considered evidence concerning prior allegations about petitioners even though it was not the basis for removal. The Bureau points out that although petitioners objected to January 2015 case notes on the basis of hearsay, they did not object because the information was stale. The lack of a timely objection on this basis is an alternative reason for denying this claim. (See Evid. Code § 353.)

### III.

Petitioners contend, correctly, that the juvenile court rejected as a basis for removal the reasons given by the licensing agency for decertifying petitioners' home. Specifically, the court did not consider corporal punishment leaving no marks to be abuse and did not consider a BB gun found in a desk to be a valid basis for removal. That, however, does not mean that the Bureau should not have removed the children or that the juvenile court erred in upholding the removal to be in the children's best interests.

The children were placed under the care of the Bureau pursuant to section 361.2, subdivision (e). The Bureau placed them with a licensed foster family agency in Alameda County. The foster family agency placed them in petitioners' family home "certified by the agency as meeting licensing standards." (§ 361.2, subd. (e)(7).) Once the foster family agency decertified petitioners' home, there was no authority for the children to remain there, and their removal was justified.

Petitioners contend that the Bureau ought to have placed the children with them pursuant to alternate statutory authority (§ 361.2, subd. (e)(3)) allowing their placement with a nonrelative extended family member. They do not support this contention with any binding authority or logical argument. For example, they do not explain why, if they no longer met the licensing standards for foster homes, they would meet the standards for placement of a child with a nonrelative extended family member. Given the concern raised about the children's safety with petitioners in their capacity of running a "suitable

10

licensed foster home," we fail to see why it would be safe to place the children with them as nonrelative extended family members. Because the petition does not develop this contention, we will not discuss it further. (See *In re S.C.* (2006) 138 Cal.App.4th 396, 408 [when a point is asserted without argument and authority it requires no discussion by the reviewing court].)

Although the juvenile court rejected the foster family agency's reasons for decertifying the home, the court found other reasons the removal was in the children's best interests. The use of the alarm to change C.S.'s behavior when she had been traumatized and was suffering from night terrors, and the improvement in C.S.'s symptoms after she was removed from petitioners' home and placed with the new foster family support the court's conclusion. So does the foster father's reluctance to adopt C.S. and concerns about whether petitioners had the wherewithal to adequately address C.S.'s needs. It is immaterial that these reasons differ from the reasons the home was decertified. The reasons given by the juvenile court of inappropriate discipline for a traumatized child—a marked improvement in behavior after removal, and the prospective adoptive father's reluctance to adopt—are solid, weighty factors supporting the juvenile court's decision.

Petitioners also argue there is no viable evidence that the children's new foster home was better suited for them than their placement with petitioners. S.S.'s testimony at the hearing attempted to refute the contention that the new foster home was better able to meet the children's needs. The juvenile court, however, found her testimony not to be credible, whereas it found the Bureau's witnesses to be credible. We are bound by the juvenile court's assessment of witness' demeanor and credibility. (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 974.) Especially in light of the juvenile court's credibility determinations, its determination that the change in placement was in the children's best interests is supported by substantial evidence, and the decision to authorize the change in their placement was well within the juvenile court's discretion.

11

**DISPOSITION**

For the reasons given above, the petition for an extraordinary writ is denied. Our decision is immediately final as to this court. (Cal. Rules of Court, rules 8.452(i), 8.490(b)(2)(A).)

_____

Siggins, J.

We concur:


_____

McGuiness, P.J.


_____

Jenkins, J.

*S.S. v. Superior Court*, A146323