Filed 9/9/22 T.J. v. Superior Court CA4/2

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| T.J.,<br><br>　　　　Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF<br>SAN BERNARDINO COUNTY,<br><br>　　　　Respondent;<br><br>SAN BERNARDINO COUNTY<br>CHILDREN AND FAMILY SERVICES,<br><br>　　　　Real Party in Interest. | E079293<br><br>(Super.Ct.No. J281964)<br><br>OPINION |

ORIGINAL PROCEEDINGS; petition for extraordinary writ. Erin K. Alexander, Judge. Petition denied.

Friedland & Associates and Amy Stanton, for Petitioner.

No appearance for Respondent.

Tom Bunton, County Counsel, and Joseph R. Barrell, Deputy County Counsel, for Real Party in Interest.

Petitioner T.J., the former caretaker for her maternal cousin S.A., filed this petition for extraordinary writ after the juvenile court removed S.A. from her care under Welfare and Institutions Code section 366.26, subdivision (n).[1] T.J. argues the court erred in concluding removal was in S.A.'s best interest. We find sufficient evidence for the removal and therefore deny the petition.

FACTS

S.A. is three years old and was removed from his parents' care shortly after birth. San Bernardino County Children and Family Services (the department) completed a Resource Family Approval (RFA) referral and placed S.A. with T.J. in August 2019. In January 2020, T.J. received an RFA license. The next month, T.J. told the department she was willing to be a concurrent placement. At the time, T.J. had been a foster parent for over 15 years. T.J. lived with two adult daughters, an adoptive teenage son, and three more children she had legal guardianship over. In addition, she had one biological adult son, one biological adult daughter, and two adoptive adult sons who, as of January 2021, did not live in the home.

The court terminated mother's reunification services in June 2020. The court continued S.A.'s placement with T.J. and noted this placement was a concurrent planning home.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

2

As of October 2020, S.A. was attached to T.J. and comfortable in her home. In January 2021, the department identified T.J. as S.A.'s prospective adoptive parent. S.A. appeared "to be very comfortable in the home environment and in the care of [T.J.] as they have a very loving relationship with each other." The department also stated "[t]here is a mutual attachment between the child and his caregiver and the child relates to [T.J.] and recognizes her as a parental figure." T.J.'s home met RFA licensing requirements. Accordingly, the department recommended the juvenile court free S.A. for T.J. to adopt.

In April 2021, the court terminated S.A.'s parents' parental rights. It found S.A. generally and specifically adoptable, and it continued his placement with T.J.

In October 2021, the department received a referral alleging T.J.'s adult son J. was living in her home. This was not the first time the department received a referral alleging J. was living with T.J., but the record does not disclose how many previous referrals the department received or when it received these referrals. This latest referral, like all previous referrals, was closed as unfounded.

Seven months later, on May 25, 2022, the department conducted an unannounced visit to T.J.'s home. The social worker noted an odor of marijuana from outside the house. When she knocked, T.J.'s adult son J. answered the door. The social worker went into the garage and saw evidence J. was living there, such as a bong J. admitted was his, a mini fridge with food, and a makeshift bed. J. told the social worker that he sleeps in the garage " 'a lot' "—staying for a few days and leaving for a few days—but doesn't live in

3

the home. He said this arrangement had been going on for " 'a while,' " and that he was currently homeless. T.J. said she allowed J. to stay for a few days at a time, but claimed it only started recently when his car caught fire. T.J. also disclosed that J. has a history of using methamphetamine but that " 'he doesn't use it here.' " She also admitted the department did not know he was allowed to stay in the home.

The social worker then toured the rest of the home. She found empty alcohol bottles, which T.J. said were from a " 'champagne party' " for her teenage son. T.J. quickly clarified she did not drink, and the children drank apple cider. The social worker also noted a broken window, an open bleach bottle with a missing cap sitting on a bathroom counter, and dry fecal matter on the floor. T.J. said she did not know how the window was broken, but that she had contacted the landlord about it and was waiting for them to fix it. T.J. also told the social worker she gave S.A. cough syrup before every bath because if she does not he gets feverish and has a runny nose. She said she bathed him three to four times a week.

On May 26, 2022—the day after the unannounced home visit—the department received a referral alleging general neglect based on similar facts to those observed by the social worker. On June 1 the department visited the home again, and the bottle of bleach was still on the bathroom counter.

On June 3, 2022, S.A.'s counsel filed a petition under section 388 requesting the court reverse its order placing S.A. with T.J. and remove S.A. from her home. Sometime prior to June 9, 2022, the department decided to remove S.A. on an emergency basis.

4

When it contacted T.J. to inform her of this, she told the department she was in Las Vegas with S.A. She had not notified the department of this out of state travel, nor cleared it with the department.

On June 9, 2022, the department went to the home to remove S.A. During the removal, T.J. told the department that she kicked J. out. The department confirmed that none of J.'s belongings were in the garage and there was no sign he was living there. T.J. said he started staying in the home at the end of May, despite the department having received multiple referrals alleging he was staying there earlier than that, including a referral from the previous October. The department confirmed the broken window was fixed and there was no longer an open bottle of bleach sitting out.

The next day the department notified the court that it removed S.A. from T.J.'s home. T.J. objected to the removal.

On June 16, 2022, the department filed a report disclosing, among other things, that J. had a criminal history dating back to 2015. It is unclear whether J. was convicted of the crimes the department identified, but between 2015 and 2020, J. was charged with a crime at least seven times: once in 2015 for drug possession while armed, twice for possession of drug paraphernalia in 2016 and 2017, twice for weapons possession in 2018, once for assault in 2020, and once for domestic battery in 2020. In the same report the department expressed concern T.J. was "not being completely truthful due to the different versions [she] has provided to different agencies/departments . . . regarding her

5

son's place of residence." The department also reported that the RFA social worker would decide whether to decertify T.J.'s home within 60 days.

The court heard the notice of emergency removal and minor's section 388 petition together at the end of June 2022. T.J. told the court J. did not live with her, that she was not aware of his criminal record, and that she would not have allowed him access to the home if she had known. She said when he was in the home, it was only to shower and eat. She also denied ever giving S.A. cough syrup, saying she only gave him Tylenol once. She reiterated multiple times that she fostered children for nearly 20 years, never had a child removed before, and felt she deserved a second chance. T.J.'s daughter also told the court that T.J. loved S.A., and that she and her family all missed him.

The court noted that "[t]here were a number of referrals" regarding J. living in the house and "whether he was living there or staying for a day or two here or there," the referrals put T.J. "on notice . . . that he can't be there around the child." Moreover the court was concerned because "he is not there just taking a shower. He is in the garage with a bong accessible to a 2-year-old filled with marijuana." Though the court acknowledged that there was no reason to believe T.J. should have known of J.'s criminal history, this ignorance was itself a problem since she was allowing him access to S.A. without knowing his history. The court also found T.J.'s long history of fostering cut both ways as it showed she was an experienced, dedicated foster parent, but also that she should have known better than to allow J. access to S.A. Finally, the court "note[d] that the information in the report is that licensing looks like it's going to be an issue."

Accordingly, the court found it was in S.A.'s best interest to grant the department's removal request and the minor's section 388 petition and remove him from T.J.'s home.

T.J. later notified the court that she was seeking a restraining order against J.

ANALYSIS

T.J. argues the juvenile court erred in finding that removal was in S.A.'s best interest. We disagree.

Under section 366.26, subdivision (n)(3)(B), a "child may not be removed from the home of the designated prospective adoptive parent unless the court finds that removal is in the child's best interest."[2] "In determining best interest, the court must consider the minor's current circumstances." (*State Dept. of Social Services v. Superior Court* (2008) 162 Cal.App.4th 273, 284.) "A primary consideration in determining the child's best interest is the goal of assuring stability and continuity of care." (*Id.* at p. 287.) Overall "[t]he concept of best interest 'is an elusive guideline that belies rigid definition. Its purpose is to maximize a child's opportunity to develop into a stable, well-adjusted adult.'" (*Id.* at p. 286.) "Thus, in deciding what is in the child's best interest, the court properly considers the long-term nurturing and growth of the child, as well as

_____

[2] Though the court did not designate T.J. a prospective adoptive parent under section 366.26, subdivision (n), it nevertheless afforded her the rights she would have had as a prospective adoptive parent, most notably the right not to have S.A. removed without first finding that removal was in S.A.'s best interest. (§ 366.26, subd. (n)(3)(B).) Therefore, we need not decide whether the court erred by not designating her a prospective adoptive parent, as even if it did that error was harmless. (See *In re L.M.* (2019) 39 Cal.App.5th 898, 909-910 (*L.M.*).) We also follow the juvenile court's lead and treat T.J. as if she was a prospective adoptive parent for purposes of this appeal.

the child's future physical, mental, and emotional needs." (*L.M.*, *supra*, 39 Cal.App.5th at p. 911.)

"On appeal from an order of removal under section 366.26[, subdivision ](n)(3), we determine whether the record contains substantial evidence to support the trial court's finding that removal was in the child's best interest. [Citation.] Under the substantial evidence standard of review, an appellate court reviews the record in the light most favorable to the trial court's findings." (*L.M.*, *supra*, 39 Cal.App.5th at p. 913.)

Substantial evidence supported the juvenile court's finding that removal was in S.A.'s best interest. It is uncontested that T.J. allowed her adult son J.—who had a criminal record and substance abuse issues—access to her home without the department or court's approval. J.'s criminal history also indicated he was a potentially serious threat. While many of his early charges involved possession of drug paraphernalia, the charges escalated in severity to weapons possession and then to violent crimes. Indeed, J. was charged with assault and domestic battery in 2020, while S.A. was already living with T.J.

Nor is T.J.'s ignorance of J.'s criminal history an adequate defense for her actions. Regardless of his criminal history, T.J. knew the department did not want him staying in the home without at least being notified. The department performed multiple investigations into allegations that J. was living in the home. While these investigations found the allegations unfounded, they put T.J. on notice that at a minimum the department was concerned about him potentially living in the home, and that she was

8

required to at least notify them if he was living there. Therefore, whether T.J. knew about J.'s criminal history, she at least knew the department did not want J. living in the home without its knowledge and approval.

In addition, T.J.'s actions as a foster parent provide additional evidence that removal may have been in S.A.'s best interest. T.J. initially admitted to giving S.A. cough medicine before every bath—possibly up to 3-4 times a week—despite no indicated medical reason to do so. T.J. also took S.A. with her out of state without notifying the department. Indeed, T.J. took this trip after the unannounced visit which set these proceedings in motion, at a time when T.J. should have known she would be under greater scrutiny. There is also some evidence that T.J. threw a party where she may have permitted underage drinking. Given T.J.'s extensive experience as a foster caretaker of nearly 20 years, the juvenile court could have reasonably concluded that none of these actions were excusable as mistakes of ignorance or inadvertence, and that each suggested S.A. might be better placed elsewhere.

Finally, there were also several issues with the home. The department found an unsecured, open bottle of bleach left out on a bathroom counter with a toddler in the house. Even worse, the bleach remained out when the department visited again just under a week later. J.'s bong was also packed with marijuana sitting in the garage, and there were empty alcohol bottles throughout the home. Finally, there was dried feces on the floor and a broken window, both of which represented obvious safety hazards. All

9

these conditions supported the juvenile court's conclusion that removal was in S.A.'s best interest.

T.J. argues the juvenile court did not give sufficient weight to her and S.A.'s bond, and that removal conflicts with the goal of " 'limit[ing] the removal of a dependent child from his or her caretaker's home after parental rights are terminated, if the caretaker is a designated or qualified as a prospective adoptive parent, as defined, in order to "protect the stability and best interests of vulnerable children." ' " (*T.W. v. Superior Court* (2012) 203 Cal.App.4th 30, 44, quoting Assembly Com. on Judiciary, com. on Sen. Bill No. 218 (2005-2006 Reg. Sess.).) However, the court did consider the bond between T.J. and S.A. and the benefits of stability. The court heard statements from both T.J. and her daughter on the bond between T.J. and S.A. The court also acknowledged this bond, saying, "I think it is clear [T.J.] is very passionate today, and I think it is clear that comes from a love of the children . . . . [I]t is clear to the Court that she loves this little boy." Thus, the court considered the bond between S.A. and T.J., and even found the bond to be substantial, but concluded it was still in S.A.'s best interest to be removed. Whether we agree with this assessment or not, we cannot say it was unsupported by the evidence.

Finally, T.J. argues the juvenile court erred by relying on the possibility that T.J. would lose her RFA license as a reason to remove S.A. However, T.J. cites no authority precluding a court from considering licensure issues in its best interest analysis. T.J. relies on *In re Maria Q.* (2018) 28 Cal.App.5th 577 (*Maria Q.*) for the proposition that RFA licensure issues are not a sufficient basis for removing children from a prospective

10

adoptive parent.  However, *Maria Q.* concerned whether the statutory preference for placing a child with a relative under section 361.3 applies even after the 366.26 hearing where the child remains in foster care.  (*Maria Q.* at p. 595.)  It did not concern removal under section 366.26, subdivision (n).  The only similarity between the two statutes is that assessment of a relative placement under section 361.3 requires assessing what would be in the child's best interest.  *Maria Q.*, though, recognized the best interest analysis under section 361.3 is different from a " 'generalized' " best interest analysis.  (*Maria Q.* at pp. 599-600 ["The record belies Appellants' assertion the juvenile court incorrectly proceeded under a 'generalized' best interest standard . . . .  Although the juvenile court did not formally consider the section 361.3 factors, the juvenile court's remarks indicate it conducted a multifactorial assessment of [the children's] best interests."].)  *Maria Q.* thus concerns a different statute and a different kind of "best interest" analysis than the statute and analysis here.

Moreover, *Maria Q.* did not forbid consideration of licensure issues under the section 361.3 best interest analysis.  Instead, it affirmed the juvenile court's conclusion that removal was not in the children's best interest "even in view of the uncertainties about the [foster parents'] ability to provide a permanent placement."  (*Maria Q.*, *supra*, 28 Cal.App.5th at p. 600.)  In other words, *Maria Q.* implicitly held that a juvenile court could consider the uncertainty of a given placement in assessing a child's best interest under section 361.3, it merely found that the uncertainties in that case were not sufficient to justify removal.

Finally, there was sufficient additional evidence to support the juvenile court's holding even without considering the licensure issue. As discussed above, both the court and the department had serious and justifiable reservations about T.J.'s home, her willingness to give unapproved adults access to S.A., and her capabilities as a foster parent and eventual adoptive parent.

## DISPOSITION

We deny the writ petition.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAPHAEL

J.

We concur:


MILLER

Acting P. J.


MENETREZ

J.