Filed 9/2/22  In re A.A. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.A. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>A.A.,<br><br>　　　Defendant and Appellant. | E078513<br><br>(Super.Ct.Nos. J289360, J289361, J289362)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Lynn M. Poncin, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Jill Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Tom Bunton, County Counsel, and Svetlana Kauper, Deputy County Counsel, for Plaintiff and Respondent.

1

This is a "shaken baby" dependency case.

A.A. (mother) appeals from jurisdictional orders finding dependency jurisdiction over her three daughters on multiple grounds, including severe physical abuse (Welf. & Inst. Code, § 300, subd. (e))[1] and abuse of a sibling (*id*., subd. (j)), and dispositional orders denying reunification services for her, based on severe physical harm (§ 361.5, subd. (b)(6)(A).)

She contends that:

(1)  The juvenile court erred by finding dependency jurisdiction over her three daughters based on severe physical abuse of the youngest, because there was insufficient evidence that she inflicted the severe physical abuse.

(2)  The juvenile court erred by denying reunification services for her, because:

(a)  It never found severe physical abuse by clear and convincing evidence.

(b)  Its finding that the children could not safely be returned to her within 12 months was not supported by substantial evidence.

(c)  It erroneously considered the likelihood of return within six months, rather than within twelve months.

(d)  It erroneously relied on its own judgment rather than on the opinion of her expert witness.

(e)  Its findings are internally contradictory.

---

[1]  All further statutory citations are to the Welfare and Institutions Code.

(f)  It did not consider all of the prescribed statutory factors.

(g)  It did not consider the best interest of the two older girls, who were not physically abused — particularly, whether they wanted to return home.

We reject all of these contentions except the last.  We agree that the juvenile court's findings show that it did not fully consider the best interest of the two older girls. There is a reasonable probability that, if it had fully considered their best interest, it would have granted the mother reunification services.  However, we cannot say that it would have been an abuse of discretion to deny reunification services.  Accordingly, we will reverse and remand for reconsideration.

I

STATEMENT OF THE CASE

The parents were married and living together with their three daughters, all under five — Av.A. (Av.), born in 2017; J.A. (J.), born in 2018; and An.A. (An. or baby), born in 2021.

In May 2021, when An. was four months old, she was taken to a hospital, where she was found to have a "brain bleed."  The parents had no explanation for this injury. Children and Family Services (CFS) therefore detained all three children and filed dependency petitions concerning them.  They were placed with a cousin on the father's side.

At the detention hearing, the juvenile court ordered: "Pending the development of the case plan, [CFS] shall provide services in order to reunify the child(ren) with the family."

In February 2022, at the jurisdictional/dispositional hearing, the juvenile court found true that:

"While in the care and custody of the mother, . . . [An.] sustained the following non-accidental injury, . . . brain bleeding, placing the child at substantial risk of further harm."

"The mother . . . is suffering from depression, which has impaired her ability to appropriately care for [An.], placing the child at risk of abuse and/or neglect."

"[The] father remains in [the] home [but] has not taken steps to protect the child."

Thus, it found that it had jurisdiction:

(1)  Over all three children based on risk of serious physical harm (§ 300, subd. (a)) and failure to protect (*id*., subd. (b));

(2)  Over An., based on severe physical abuse (*id*., subd. (e)); and

(3)  Over J. and Av. based on abuse of a sibling (*id*., subd. (j)).

It formally removed the children from the parents' custody.  It ordered reunification services for the father but denied them to the mother.

4

## II

### THE FINDING OF SEVERE PHYSICAL ABUSE

The mother contends that the jurisdictional finding of severe physical abuse as to An. (§ 300, subd. (a)) — and thus also the findings of abuse of a sibling as to Av. and J. (*id*., subd. (j)) — were not supported by substantial evidence.

A.    *Additional Factual Background*.

The evidence before the juvenile court at the jurisdictional hearing consisted of five specified social worker's reports, and the oral testimony of the mother and the father. We limit our consideration to this evidence. (See *In re L.A.-O.* (2021) 73 Cal.App.5th 197, 207-208.)

When the mother was a child herself, she was physically abused by her mother and sexually abused by men her mother brought home. When she was three, she was removed; she was placed sometimes with relatives and sometimes in foster care. Eventually, she was adopted; however, her adoptive mother was abusive.

The mother had had ADHD "all [her] life," PTSD since she was three, and depression since she was six. She had also been diagnosed with anxiety. She was seeing a psychologist and a therapist and taking Wellbutrin, Ativan, and Adderall.

When she was pregnant with An., the mother's water broke too early. She was hospitalized for two weeks and given medication to postpone labor. In January 2021, the baby was born prematurely, at 34 weeks, via Caesarian section. The baby was in the newborn intensive care unit (NICU) for two and a half weeks; for the first week and a

half, while she was intubated, the parents were allowed to touch her hand but not to hold her.

After the baby was released, on one occasion, the parents took her to her pediatrician because she was vomiting and "stiff." According to the parents, she would stiffen when they picked her up. Also, "the whole family had a stomach bug and had been throwing up a lot."

The father worked two jobs. The parents lived with the father's parents and sister, but they, too, worked during the day. After the baby was born, the mother did not work; she was the main caretaker for all three children and was home alone with them "the majority of the time."

One day in May 2021, the father came home for a lunch break, then left sometime between 3:50 and 4:10 p.m. to go back to work. Around 4:50 p.m., the mother called 911. The baby was taken by ambulance to the emergency room at Loma Linda University Medical Center.

The mother explained that, just after the father left for work, the baby "projectile vomited" and started to cry. She cleaned the vomit out of the baby's mouth and set her down on a bed. The baby stopped crying and became limp and unresponsive.

A CAT scan showed bleeding on the brain on both sides of the head. A subsequent MRI showed that some of the bleeding was recent and some of it was older. The bleeding was severe enough to cause anemia. An ophthalmologist found retinal

bleeding, in multiple layers, in the left eye. The baby had bruises and abrasions on her face.

In the opinion of a forensic pediatrician, "the [brain] injury was most likely caused by an acceleration and deceleration of the child's head . . . consistent with shaken baby." She believed the baby had been shaken twice: once days or weeks before the 911 call — probably when she was taken to her pediatrician; and again not more than two or three days before the 911 call — probably that same day. The baby's brain injuries could not have resulted from being born prematurely. These injuries "ha[d] the potential to have long[-]lasting effects such as learning disabilities." The baby's facial injuries were "concerning for an impact or grab to the face."

Both parents denied harming the baby. The mother said she did not know how the injuries could have happened. She admitted that she was "stressed" and suffering from depression.[2] She said the baby was fussier and harder to console than the two older girls had been. She also said she "felt she and the child never bonded. . . . [T]he child will cry and even when she picks her up, the child will not stop, leading her to believe the child does not like her."

---

[2] According to both a social worker and the forensic pediatrician, the mother said she had postpartum depression. Later, she said that she had depression while in the hospital, but not after An. was born; she denied telling anyone that she had postpartum depression. The juvenile court struck an allegation that she had postpartum depression but found that she did have depression. We take her statements to mean that her chronic depression was not under control or in remission.

Av., aged four, told the social worker the baby "was at the hospital because she threw up milk." She also said the mother "never feel[s] good, we have to give her medicine." Av. had a cluster of bruises on her right leg that could have been a "grab mark" or the result of "accidental play." J., aged two, also had bruises on her legs that "could be the result of accidental or inflicted mechanisms . . . ."

B.      *Additional Procedural Background.*

The juvenile court ruled: "[I]t's clear . . . that this was not accidental trauma . . . . It's clear that the child was abused." "An[.]'s injuries are consistent with more than one instance of abusive head trauma." "The mother is the main caretaker for this child." "So there is sufficient evidence that the child . . . was injured while in the care and custody of [the mother]." It found insufficient evidence that the father knew or should have known that An. was being abused.

C.      *Discussion.*

The juvenile court also found jurisdiction over all three children based on risk of serious physical harm (§ 300, subd. (a)) and failure to protect (*id*., subd. (b)). The mother does not challenge these findings. Nevertheless, the finding of severe physical abuse (*id*., subd. (e)) is neither moot nor harmless, because it was the basis for the juvenile court's denial of reunification services to the mother. (Cf. *In re I.J.* (2013) 56 Cal.4th 766, 773.)

Under section 300, subdivision (e), the juvenile court has jurisdiction if "[t]he child is under five years of age and has suffered severe physical abuse by a parent . . . . For the purposes of this subdivision, 'severe physical abuse' means any of the following:

8

any single act of abuse that causes physical trauma of sufficient severity that, if left untreated, would cause permanent physical disfigurement, permanent physical disability, or death; . . . or more than one act of physical abuse, each of which causes bleeding, deep bruising, significant external or internal swelling, bone fracture, or unconsciousness . . . .”

Under section 300, subdivision (j), the juvenile court has jurisdiction if “[t]he child’s sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions.”

Jurisdiction need only be proven “by a preponderance of [the] evidence . . . .” (§ 355, subd. (a).)

“‘In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings . . . , we determine if substantial evidence, contradicted or uncontradicted, supports them. “In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court’s determinations; and we note that issues of fact and credibility are the province of the trial court.” [Citation.]’” (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.)

The mother does not dispute that An. was under five and that her injuries constituted severe physical abuse. She also does not dispute that, if the finding of severe physical abuse was supported by substantial evidence, then the findings of abuse of a sibling were, as well. She argues only that there was insufficient evidence that she was

9

the perpetrator. She notes that "there were four other adults and two other children living in the home." She also cites evidence that "the other adults in the home provided care . . . ."

The mother testified that, *when she worked*, the paternal grandmother and aunt provided some care for *the two older girls*. After she gave birth to the baby, however, she stopped working. The other adults in the household were still working. Thus, "the mother [was] alone with all three . . . children the majority of the time." She was "the main caretaker" except when she "ha[d] to go to . . . the store . . . ."

The mother admitted that the father watched the children only "[o]n his days off work." The father testified that the only times he took care of An. alone were when the mother took a shower, went out to the store, or did chores; when he did, however, An. was usually asleep. At first, he agreed with a leading question suggesting that he took care of the An. ten percent of the time, but then, he said "I can't give you an exact percentage."

The mother told police that "she had been home alone the entire day." At trial, she testified that "[o]n the day of the incident," she and the father were the baby's only caretakers. The father went beyond this; he testified that "[i]n the week leading up to the hospital, . . . only [he] and [the mother] cared for An[.]"

Admittedly, the mother testified that the care of An. was split "50/50" between her and the rest of the family. The juvenile court did not have to believe her, particularly in light of the other evidence contradicting her. It may have been true of the older girls,

when the mother worked, but it did not appear to be true of An. Moreover, she did not call the paternal grandmother or aunt to corroborate it.

The mother also overlooks the evidence that she was uniquely predisposed to physically abuse An. According to a social worker's report, she admitted to two police officers that she was "stressed," that she and the baby "never bonded," that she felt the baby "does not like her," that the baby was "fussier and harder to console" than her older girls, and that "the child will cry and even when she picks her up, the child will not stop, leading her to believe the child does not like her." At trial, the mother flatly denied making such statements. Again, however, the trial court did not have to believe her. She could have called the officers or the social worker to impeach the report, but she did not.

Finally, the evidence showed that the baby had been shaken twice, in a similar manner, causing similar injuries. It was overwhelmingly likely that the perpetrator was the same person both times. And it was overwhelmingly *unlikely* that one of the other adults in the household, who took care of An. only briefly, when the mother showered or did errands, would have been in a position *and* been motivated to shake An. twice.

The mother argues that the most recent shaking incident could have occurred as much as two or three days before the 911 call. Actually, the forensic pediatrician opined that "the new blood indicated the child was shaken recently, within two . . . to three . . . days of being seen; however, based on the symptomology, *she seemed to have been*

11

*shaken that day . . . .*" (Italics added.)[3]  In any event, the mother was the main caretaker at all times.  Again, the father testified that "[i]n the week leading up to the hospital, . . . only [he] and [the mother] cared for An[.],"and he took care of her rarely and usually only when she was asleep.

The mother also argues that there was no evidence that she had ever physically abused the two older girls.  The evidence showed, however, that she experienced frustration, difficulty, and disappointment in caring for An. that she had not experienced with the two older girls.

Finally, the mother argues that paramedics could have inflicted An.'s bruises and abrasions.  That is beside the point; those were not *severe* physical injuries and were not the basis of the juvenile court's jurisdictional findings.

We therefore conclude that the jurisdictional findings of severe physical abuse and abuse of a sibling were supported by substantial evidence.

III

THE DENIAL OF REUNIFICATION SERVICES

The mother contends that the juvenile court erred by denying her reunification services.

---

**3**     A police officer opined "that symptoms of shaken baby usually occur within an hour of the incident."

A. *Additional Factual Background.*

In the dispositional phase, the juvenile court heard additional testimony by the mother, an expert witness, and the social worker.

1. *Testimony of the mother.*

The mother had completed her case plan, consisting of 8 Zoom counseling sessions, 12 parenting class sessions, and 12 anger management class sessions. She was also seeing a private counselor through Kaiser Permanente. She felt that she had learned from her services. She was willing to engage in further counseling even if it involved "the cause of An[.]'s injury" and to be "open and honest" and "truthful and frank" in that counseling.

The mother had supervised visitation with the children twice a week, for two hours or more at a time. According to the caregiver, "the mother and father are very engaged with the children . . . [they] bring snacks for the children, engage with them and take turns playing with each one . . . . [They] also facilitate all sorts of activities for the children during visits (making poster boards, playing games, doing arts and crafts). [They] also check in with [the caregiver] to see how the children are doing or to see if they need anything. . . . [They] provide the caregiver with items for the girls including diapers, wipes, and clothing. . . . [They] also share with [the caregiver] what they are learning in their classes (specifically parenting education)."

According to the mother, when the children saw the parents, they cried and ran to them. J. competed with Av. for the mother's affection. An. crawled up onto her. At the

13

end of visits, the children would cry, unless she distracted them with toys or candy. An., she testified, "[i]s doing great. She's talking, she's crawling, and she's also starting to walk."

When asked, "[D]o you believe that you were at all responsible for your daughter's being injured?," she answered, "[W]ith everything that's been said, it does make me feel that way, but I know in my heart I'm not . . . ." She did not believe there was anything she could have done differently.

### 2. *Testimony of Dr. Roberts*.

Dr. Kristina Roberts, a psychologist, had carried out a psychological evaluation of the mother, including an interview and standardized testing. All of the test results were within normal limits. Her responses were somewhat "defensive" and therefore possibly "understated." However, that is "typical" in dependency cases. Dr. Roberts agreed that there is "no test . . . that indicates whether or not a parent is likely to abuse a child."

Dr. Roberts testified, "I can't ever predict exactly[, but m]y impression is that services for six months would allow [the mother] to safely parent her children." She explained that the mother was "open and cooperative," "consistent as far as setting up appointments," "prompt," and "able to introspect." She was aware of her depression, and it was being addressed via medication and therapy. She "ha[d] good insight into her behavior[.]" She would be able to "internalize information" about parenting, including "safety issues."

14

The mother did not acknowledge to Dr. Roberts that the baby had been abused; she said "she [wa]s unsure what happened to her daughter." Dr. Roberts agreed that "it's helpful" for an abuser to admit that abuse occurred. However, "people can still be helped and benefit from services and not abuse again even if they don't specifically acknowledge." Dr. Roberts also conceded that the mother would benefit if her therapy "shifted focus" to the particular issues in the dependency case.

### 3. *Testimony of the social worker*.

In the social worker's opinion, the children could not safely be returned to the mother by the 12-month review hearing. Also in her opinion, in the eight months that the mother had been receiving services, she had not made adequate progress. "[T]o this day, . . . we still have two parents who have denied that there's been abuse to a child. . . . [T]hat's a concern after eight months of services." The mother's therapy had focused on her "childhood trauma" and not on "the actual cause of the injury to the child and acceptance that the injury did occur."

### B. *Legal Background*.

"[W]hen a child is removed from parental custody, reasonable reunification services must be provided to the parent, unless one of the exceptions in section 361.5, subdivision (b) applies. [Citation.]" (*A.A. v. Superior Court* (2012) 209 Cal.App.4th 237, 242.) A finding that an exception applies must be made by clear and convincing evidence. (§ 361.5, subd. (b).)

One exception, under section 361.5, subdivision (b)(5), applies when "the child was brought within the jurisdiction of the court under subdivision (e) of Section 300 because of the conduct of that parent or guardian."

Whenever section 361.5, subdivision (b)(5) applies, the juvenile court must bypass reunification services "unless it finds that, based on competent evidence, those services are likely to prevent reabuse or continued neglect of the child or that failure to try reunification will be detrimental to the child because the child is closely and positively attached to that parent."  (§ 361.5, subd. (c)(3).)

Another exception, under section 361.5, subdivision (b)(6)(A), applies when "the child has been adjudicated a dependent . . . as a result of . . . the infliction of severe physical harm to the child [or] a sibling . . . by a parent . . . , and the court makes a factual finding that it would not benefit the child to pursue reunification services with the offending parent . . . ."

Whenever section 361.5, subdivision (b)(6) applies, the juvenile court must bypass reunification services "unless the court finds, by clear and convincing evidence, that reunification is in the best interest of the child."  (§ 361.5, subd. (c)(2).)

"In determining whether reunification services will benefit the child . . . , the court shall consider any information it deems relevant, including the following factors:

"(1)  The specific act or omission comprising the severe sexual abuse or the severe physical harm inflicted on the child or the child's sibling . . . .

16

"(2)  The circumstances under which the abuse or harm was inflicted on the child or the child's sibling . . . .

"(3)  The severity of the emotional trauma suffered by the child or the child's sibling . . . .

"(4)  Any history of abuse of other children by the offending parent or guardian.

"(5)  The likelihood that the child may be safely returned to the care of the offending parent or guardian within 12 months with no continuing supervision.

"(6)  Whether or not the child desires to be reunified with the offending parent or guardian."  (§ 361.5, subd. (i).)

The juvenile court must "specify the factual findings used to determine that the provision of reunification services to the offending parent . . . would not benefit the child."  (§ 361.5, subd. (k).)

C.     *Additional Procedural Background*.

As mentioned, for purposes of jurisdiction, the juvenile court needed to find severe physical abuse merely by the preponderance of the evidence.  At the beginning of the dispositional phase, counsel for CFS asked if it had found severe physical abuse by clear and convincing evidence.  It replied, "Not yet.  I was going to do that today."

At the end of the dispositional phase, the juvenile court found:  "The clear and convincing evidence . . . is the infliction of severe injuries on An[.] . . .  [I]n the jurisdiction portion of the hearing, the Court believed, based on the evidence presented, that [the mother] was the perpetrator of the abuse suffered by An[.] . . .  So . . . there's

17

clear and convincing evidence for the bypass provision to apply in this case under . . . [s]ection 361.5 [s]ubsection (b), [s]ubsection 5 and [s]ubsection (b), [s]ubsection 6."

For purposes of section 361.5, subdivision (b)(5), however, it also found that "services are likely to prevent reabuse or continued neglect of the children," because "it does appear that the mother and father have benefited somewhat from services."

For purposes of section 361.5, subdivision (b)(6), it found that reunification was not in the best interest of the children. It considered all six statutorily enumerated factors (see § 361.5, subd. (i)), as follows:

Regarding "the specific acts or omissions constituting the abuse or harm," it found that "An[.] was severely injured, not once, but at least twice . . . ."

Regarding "the circumstances under which the abuse or harm was inflicted," it found that "[the mother] was under the stress of taking care of three little children, one of whom was in the neonatal intensive care unit for two weeks . . . . And . . . she was . . . the only person caring for the children."

Regarding "the severity of emotional trauma suffered," it found "[t]hat factor does not apply in this case . . . ."

Regarding "any history of abuse by the offending parent," it found, "Again, this is not a single incident of abuse by [the mother]."

Regarding "whether the child wants to return home," it found that "An[.] is too young to provide testimony regarding what she would want . . . ."

Finally, it found that the mother had not met her burden of proving "that it's likely the children will be returned to the home of the mother within 12 months without continuing supervision," because she denied injuring the child and said she would not have done anything differently. It considered this last factor to be "[t]he true issue."

Accordingly, it denied reunification services to the mother under section 361.5 subdivision (b)(6).**4**

D. *Discussion.*

We apply a mixed standard of review.

"Where the court makes factual findings that a bypass section applies, we review those factual findings under the substantial evidence standard. [Citation.]" (*A.A. v. Superior Court*, *supra*, 209 Cal.App.4th at p. 242.)

However, """[a] juvenile court has broad discretion when determining whether . . . reunification services would be in the best interests of the child under section 361.5, subdivision (c). [Citation.] An appellate court will reverse that determination only if the juvenile court abuses its discretion."' [Citations.]" (*In re A.E.* (2019) 38 Cal.App.5th 1124, 1140-1141.)

Preliminarily, the mother claims that the juvenile court never found severe physical abuse by clear and convincing evidence, as it had to do in order to deny

---

**4**      The minute orders incorrectly recite that the juvenile court bypassed reunification services for the mother under both section 361.5 subdivision (b)(5) and subdivision (b)(6).

reunification services on that ground. That is incorrect. It had not done so (and did not need to) at the beginning of the dispositional phase, but it did so at the end. The minute orders confirm that, in the dispositional phase, it found severe physical abuse by clear and convincing evidence.

The mother argues that the finding that the children could not safely be returned to her within 12 months was not supported by substantial evidence. In so arguing, she improperly focuses on the evidence favorable to her while ignoring the unfavorable evidence. (See *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.) For example, she touts Dr. Roberts's opinion that the children could safely be returned to her by the 12-month review hearing, but sweeps under the rug the social worker's opinion that they could not. She also omits Dr. Roberts's testimony that this was merely her "impression" and that "I can't ever predict exactly."

It must be remembered that it was the mother who had the burden of proof. "'[W]here the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law.' [Citation.] Specifically, we ask 'whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." [Citation.]' [Citation.]" (*In re S.G.* (2021) 71 Cal.App.5th 654, 671.)

The juvenile court's finding was supported by the social worker's opinion. That opinion, in turn, was supported by the mother's failure to take responsibility for causing

20

An.'s injuries. Denial is substantial evidence of a continuing risk. (*In re L.O.* (2021) 67 Cal.App.5th 227, 240 ["Father's failure even to acknowledge his past violent behavior, let alone express remorse or show any insight regarding it, exposes L. to a risk that he will once again attack Mother in L.'s presence."]; *In re A.F.* (2016) 3 Cal.App.5th 283, 293 ["In light of mother's failure to recognize the risks to which she was exposing the minor, there was no reason to believe the conditions would not persist should the minor remain in her home."].)

Dr. Roberts's opinion was hardly "uncontradicted and unimpeached." Based on the social worker's opinion, the mother's denial, and Dr. Roberts's own hedging, the juvenile court could reasonably find that her opinion was not credible.

The mother briefly asserts that the juvenile court actually considered only return within six months, not return within twelve months. The juvenile court noted that, due to continuances, the jurisdictional/dispositional hearing was being held on February 7-8, 2022, and a 12-month review hearing had already been set for July 29, 2022. Thus, it considered the likelihood of return in the next six months.

The mother forfeited any contention that this was error by failing to object. "[A] reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court. [Citation.]" (*In re S.B.* (2004) 32 Cal.4th 1287, 1293.)

In any event, the juvenile court did not err. "[T]he juvenile court at each step [must] consider for purposes of ordering services only probable developments in the

period for which the services can be ordered. . . . Thus, if at most four months remain until the next review hearing (i.e., the 12-month hearing or 18-month hearing), at most only four months of services can by law be ordered, and the juvenile court therefore should consider only what the impact of *those* four months of services would be on the parent and child, not whether another hypothetical two months of services beyond the next prospective hearing might have a different or additional impact." (*Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 846 [construing § 366.21, subd. (e).) As the juvenile court noted, the mother had been receiving services since the detention hearing. Thus, it was appropriate to consider whether six additional months of services — a total of 14 months — would make it possible to return the children to her safely.

The mother argues that the juvenile court erroneously "substitute[d] its own judgment for [Dr. Roberts's] expert testimony . . . ." "We reject the proposition that a court should defer to the opinion of an expert. '"To hold otherwise would be in effect to substitute a trial by 'experts' for a trial by [the finder of fact] . . . ." [Citation.]' [Citation.]" (*In re R.V.* (2015) 61 Cal.4th 181, 216.) "Expert opinion is not binding on a [trier of fact]. The [trier of fact] is free to reject even the uncontradicted testimony of an expert witness. [Citations.]" (*People v. Engstrom* (2011) 201 Cal.App.4th 174, 187, fn. omitted.) Moreover, the juvenile court's finding was supported by the social worker's contrary opinion.

The mother cites the Supreme Court's observation that "[w]ithout the testimony of psychologists, in many juvenile dependency and child custody cases superior courts and

juvenile courts would have little or no evidence, and would be reduced to arbitrary decisions based upon the emotional response of the court." (*In re Jasmon O.* (1994) 8 Cal.4th 398, 430 (*Jasmon O.*); accord, *Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738, 1749.) In other words, expert testimony can be helpful; *Jasmon O.* did not hold that it is controlling. Here, it was the mother who had the burden of proving an exception to the bypass requirement. If the juvenile court did not find her expert sufficiently credible, it was entitled to conclude that the mother had not met her burden. That was not the kind of "arbitrary" or "emotional" decision with which *Jasmon O.* was concerned.

In her reply brief, the mother argues for the first time that the juvenile court's findings are internally contradictory. She forfeited this argument by failing to raise it in her opening brief. (*In re J.N.* (2006) 138 Cal.App.4th 450, 459, fn. 5.)

Even if not forfeited, it lacks merit.

As the mother points out, with respect to section 361.5, subdivision (b)(5), the juvenile court found "that there was competent testimony that *services are likely to prevent reabuse . . . .* [A]nd that would be based on Dr. Roberts's testimony." (Italics added.) However, with respect to section 361.5, subdivision (b)(6), it said, "the Court cannot find by clear and convincing evidence that *it's likely the children will be returned to the home of the mother within 12 months* without continuing supervision." (Italics added.)

It is true that, on their face, these findings are contradictory. However, the finding for the purpose of section 361.5, subdivision (b)(5) need only be made by a preponderance of the evidence, based on "competent testimony." (§ 361.5, subd. (c)(3).) By contrast, the finding for the purpose of section 361.5, subdivision (b)(6) must be made by clear and convincing evidence. (§ 361.5, subd. (c)(2).) Evidently the juvenile court found that Dr. Roberts' testimony met the preponderance standard but not the clear and convincing standard. This was perfectly consistent.

Next, the mother argues that the juvenile court did not conduct a "full assessment" of the prescribed statutory factors. However, it listed them and made a finding on each. The mother twists the juvenile court's comment that the likelihood of return was "[t]he true issue" into an erroneous ruling that it was the "sole issue." On the whole record, however, clearly it considered all of the factors. How to weigh those factors was up to the juvenile court's discretion. It was not arbitrary or capricious for it to conclude that, despite the other factors, including severe, repeated physical abuse, if the children could be safely returned to the mother within 12 months, then she should be given reunification services — but if not, not. In fact, this particular weighting of the factors actually favored the mother.

Finally, the mother argues that "the juvenile court did not consider a vital factor — the children's desire to reunify with Mother." She also argues that "the juvenile court did not consider the evidence that Av[.] and J[.] had been in Mother's care their entire lives with no concerns. [Citations.] They were happy children, bonded to Mother."

24

Here, the mother has a point.  Regarding one of the statutory factors — "whether the child wants to return home" — the juvenile court found only that "*An*[.] is too young to provide testimony regarding what she would want . . . ."  (Italics added.)  Thus, it is clear that it did not consider whether *Av. and J.* wanted to return home.  Hence, it did not fully consider whether reunification services were in *their* best interest.

We cannot say that the error was harmless.

The applicable harmless error test is whether there is a reasonable probability that, in the absence of the error, the outcome would have been more favorable to the mother.  (See *In re Christopher L.* (2022) 12 Cal.5th 1063, 1073.)  "[A] 'probability' in this context does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*.  [Citations.]"  (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715.)

The juvenile court itself found that "the children are bonded to the mother . . . ."  There is absolutely no evidence that she had ever abused or neglected Av. or J.  The record demonstrates that, although she inflicted severe physical abuse on An., she did so in a "perfect storm" of circumstances.  The pregnancy and birth had been taxing.  The baby had been in the NICU for weeks, which interfered with normal mother-child bonding.  The mother was caring for three children under five, more or less by herself.  The baby was particularly fussy and hard to console.  The mother was admittedly stressed and depressed.  She felt the baby "d[id] not like her."

On this record, it is reasonably probable that, if the juvenile court had fully considered the question, it would have found that reunification was in Av. and J.'s best interest.

We are *not* saying that it was *required* to so find. The mother had shown a propensity to crack under pressure and to take it out on a helpless child; in the process of raising three small children to adulthood, pressure will inevitably occur again. Thus, the juvenile court *could* also reasonably have found that reunification was *not* in Av and J.'s best interest.

We conclude that we must reverse and remand for reconsideration.

IV

DISPOSITION

The order denying reunification services for the mother is reversed. On remand, the juvenile court must reconsider whether to grant the mother reunification services, in light of current circumstances. (See *State Dept. of Social Services v. Superior Court* (2008) 162 Cal.App.4th 273, 286 ["In determining best interest, the court must consider the minor's current circumstances."].) We express no opinion on how it should rule. In all other respects, the orders appealed from are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:
McKINSTER
J.
SLOUGH
J.

26